IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL JAIME INOFUENTES,<br><br>*Defendant*. | Case No. 1:25-CR-5 (PTG) |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO REVOKE THE DETENTION ORDER [DKT. 37]**

The United States of America, by and through undersigned counsel, opposes the motion of defendant, MICHAEL JAIME INOFUENTES, to revoke the detention order in this case.

During the investigation, the defendant admitted to having sex with three minor girls in Colombia, impregnating one (possibly two) of the girls, and attempting to meet a 16-year-old girl at a hotel for sex in exchange for between approximately $19 and $72 USD. At one point, the defendant told investigators that he had a preference for younger girls because "these people who are available are young" and he has a "physical attraction" to them.

The defendant cannot overcome the statutory presumption against release, but even if he could, there are no conditions of release that will reasonably assure the defendant's presence at future court hearings, or the safety of the community. Thus, the defendant's motion to revoke the detention order should be denied.

**BACKGROUND**

Since at least 2024, Homeland Security Investigations (HSI) has been investigating individuals engaged in child sex trafficking and child sex tourism in Colombia. Specifically, HSI-

1

Miami has been investigating a U.S. citizen who traveled to Colombia and engaged in sex with over 50 minor girls between the ages of 9 and 17. In August 2024, HSI issued a subpoena to Western Union seeking records of transaction history for multiple people who had been communicating with the HSI-Miami target and whom HSI suspected may also have been involved in child sex trafficking. Responsive Western Union records showed 5 payments in October 2023 made by the defendant, a U.S. citizen, to one of the individuals suspected of involvement in child sex trafficking (SUBJECT-1). HSI agents reviewed the defendant's travel history, and observed that beginning in approximately 2016, the defendant had made numerous trips to Colombia, including approximately 10 trips in 2022, 10 trips in 2023, and 14 trips in 2024.

On November 1, 2024, HSI-Miami sent a request for assistance to Customs and Border Protection (CBP) at Miami International Airport (MIA) to conduct a secondary border inspection of the defendant, who was due to arrive later that day on a flight from Medellin, Colombia. When the defendant arrived in Miami, he went through customs and was taken for a secondary border inspection, pursuant to CBP's border search authority.[1] During the inspection, CBP located two cell phones—an iPhone 14 and a Galaxy Z Fold 6. The defendant provided the passcodes for these devices, and they were subsequently manually inspected by CBP and HSI.

During the manual inspection of the iPhone 14, the HSI agent searched the Spanish words for "age" and "minor." The agent then found a WhatsApp chat thread between the defendant and an individual ("MV1"), who was later identified as a minor girl in Colombia. In the chats, the

---

[1] In his motion, the defendant repeatedly refers to the secondary border inspection as a "warrantless border search" (*see* Dkt. 38 at 2, 5, 6, 7, 10, and 11), but border searches are definitionally "warrantless" because they are a long-standing exception to the Fourth Amendment's warrant requirement. Indeed, the government's border search authority dates back to the nation's founding and is rooted in the sovereign's right, "subject to substantive limitations imposed by the Constitution," to control "who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977).

defendant and MV1 discussed that MV1 was engaged in sex work and that she could not find other work due to her status as a minor. For example, as depicted in the screenshots below, on March 9, 2024, the defendant told MV1 she could do better than sacrificing herself by "selling sex for money."

> ▣ (Michael) ↗ Read
> 3/9/2024 1:58:50.251 AM
> Pensé que te fuiste porque viste que conmigo o con un marido tú puedes vivir mejor que en el
> Centro con el sacrificio de vendiendo sexo por plata

*I thought you left because you saw that with me or with a husband you could live better than in the Center with the sacrifice of selling sex for money.*

As depicted below, later that same day, the defendant told MV1, "sex for money is killing you."

> ▣ (Michael) ↗ Read
> 3/9/2024 7:52:52.165 PM
> Sexo por dinero te esta matando

In a message on March 3, 2024, MV1 told the defendant "I am only having sex with you." A review of the defendant's travel records showed that he had flown to Colombia, through Panama, on January 27, 2024, and returned to the U.S. on March 5, 2024.

On March 22, 2024, the defendant flew back to Colombia through Panama. On March 26, 2024, at approximately 10:50pm, the defendant told MV1 he was in San Diego.[2] MV1 asked

---

[2] San Diego is the name of a street in Medellin, Colombia that is well known to law enforcement as a place where individuals go to buy sex from sex trafficked children, among other things. *See* Dkt. 14 at 7.

him if he was waiting for her, or if he was going to go with someone else. The defendant replied that he was talking with people, but he wanted her. MV1 said she was "going to work." The defendant told her, "work with me" and "I have money." *See* Exhibit 1 (English translation of the ensuing WhatsApp chat). The defendant negotiated a price with MV1—she said 80,000 Colombian Pesos (approximately $20 USD) was too low and the defendant agreed he would pay her 300,000 (approximately $72 USD) "for [her] time." The defendant suggested they meet at a hotel in San Diego "por el palo y el huevo" (i.e., "for sex and cum") and told MV1 he was on his motorcycle. MV1 replied shortly after that she could not go to San Diego, and suggested another location. The defendant put a heart on the message. After that, they stopped chatting for just over an hour. When the chat resumed, the defendant told MV1 he was sleeping, and then he turned on the disappearing messages feature in WhatsApp.³ He turned off disappearing messages approximately 11 hours later.

At MIA, the defendant was provided Miranda warnings and consented to an interview with HSI-Miami agents. The interview was audio recorded. During the interview, the defendant lied repeatedly about his connections to Colombia and the nature of his relationship with MV1.⁴ For example, when the agent asked if the defendant had any kids, he replied, "one kid, yes" and gave the name of his son who lives in the U.S. When the agent asked if the defendant had any other children "anywhere else in the world" he said, "I do. I have two kids." Those are the two

---

³ According to information posted on WhatsApp's website, disappearing messages is an optional feature that a user can turn on for more privacy. The user can set messages to disappear during a certain timeframe (e.g., 24 hours), after which time any messages exchanged in the chat no longer appear in the chat thread. The user can select disappearing messages for all chats or select it during specific chats at specific times.

⁴ Despite the defendant's assertion that he made no effort to obstruct the investigation, Dkt. 38 at 7, repeatedly lying to law enforcement is by its nature obstructive.

children he has with a Colombian woman, whom he later admitted was a minor when he got her pregnant. When the agent asked the defendant for the ages of the two children and information about them, he provided changing and non-specific answers in another attempt to evade the truth about the age of the mother of the children. The defendant also told the agent he worked full-time at Strayer University doing contract work, even though he has not worked in that job since July 2024. *See* Dkt. 38-5 at 2; *see also* Dkt. 12 (Bond Report) at 2 (the defendant's parents reported the defendant works as a musician but had lost his job at the university).

The defendant also told numerous lies about MV1 and his relationship with MV1. The agents asked the defendant about the contact entry for MV1 in his phone, which he had entered as "[name] 2024." The defendant replied, "I wrote 2024 because I'm looking for something to identify them. That would be the mother of the children." The agent clarified, "the mother?" and the defendant replied, "my two children."[5] This was of course a lie, and the defendant later admitted that this contact was MV1. The agent showed the defendant a picture of MV1 and asked who she was. The defendant stated her name and said he thought she was 17 but he has "nothing romantic with this girl." The defendant described MV1 as a "friend" and a "flirtatious thing" but not someone he associates with. He also said he had met MV1 only twice before. When asked if MV1 was involved in prostitution, the defendant stated, "not that I know of."

The defendant ultimately admitted the following about MV1 and his relationship with MV1:

- He had a sexual relationship with MV1.

- MV1 said she is pregnant, and it is possible he is the father of the baby.

---

[5] The actual contact entry in the defendant's phone for the mother of his two children in Colombia is the woman's full name.

5

- MV1 was a minor.

- He had a relationship with a different minor in Colombia in 2020 and had sex with her.

- He had sex with a minor in Colombia and has two children—born in 2017 and 2019—with her.

When asked if he had a preference for younger girls, the defendant told law enforcement,

> "Ok I've thought a lot about this, honestly. The long answer is no, but kind of yes. Ok, let me tell you. All of my life, I'd never wanted to be with a girl who was younger than me, I've always [inaudible]. After getting divorced, and this pattern that you recognize it's just because of, I guess convenience or circumstances. So, I'm old now, and these people who are available are young. So, my preference, but then I've also thought, on the other way, do I like older women? And I do. So, I can't tell you definitively . . ."

At the conclusion of the interview, the defendant left MIA and returned to Virginia. HSI detained his cell phones for forensic examination pursuant to their border search authority. On November 4, 2024, the defendant attempted to board a flight from Washington Dulles International Airport, in the Eastern District of Virginia, to Bogota, Colombia. He was stopped by HSI agents on the jet bridge and taken to a secondary inspection area for an interview. The agents gave the defendant Miranda warnings, and the defendant consented to an interview. The interview was audio recorded.

During this November 4 interview, the defendant again lied about his relationship with MV1. He told the agents they had not had sex. He later admitted the following about the March 26, 2024 chat with MV1:

- He was considering meeting up with MV1 and was offering to give her money for sex.

- "Yes, that's what the idea is here. To pay for sex. I was just kind of like joshing with her. Yes, that's the intent, yes. That's what was happening there, yes . . . that is what we were talking about, if you want to be precise."

- "Is she a prostitute? It seems to me that she has worked as a prostitute."
- "At this point in time, I'm offering her money to go to have sex with her at a hotel. And did I give her money? I don't even know if that part matters to you. I'm telling you it didn't happen."

When the agents showed the defendant the Western Union transactions with SUBJECT-1, he stated that she was "the mother of something like an ex-girlfriend" – another lie. He later stated that she was a girlfriend with "no professional relationship to [him]."

The agent asked the defendant, "why do you have sex with minors? Or why do you have sexual relationships with minors?" Then they had the following exchange:

- DEFENDANT: The reason is because I . . . I . . . I . . . by chance I find people who I more or less get along with, but this is not . . .
- AGENT: and they all just happen to be . . .?
- DEFENDANT: Not all, actually. There's plenty of people who are my age that I've, that I've hooked up with. Or older than me. Ok, that have been minors. So why . . . attraction. Physical attraction.
- AGENT: Ok, so you're physically attracted to
- DEFENDANT: To minors
- AGENT: A younger looking female . . .
- DEFENDANT: But this is not like, sure. Sure. But this is not like an intentional under-18-looking-for-minors. But yes, attracted, physically attracted to the appearance of . . . But not . . . of underage women.

The defendant stated this (having sex with minors) is not his objective "with women or in Colombia specifically, but obviously the result."

At the conclusion of the interview, the defendant was placed under arrest for engaging in illicit sexual conduct in a foreign place.

## PROCEDURAL HISTORY

On November 5, 2024, a criminal complaint was issued for the defendant charging him with engaging in illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c) and (g)(2). *See* Dkt. 1. On the same day, the defendant made his initial appearance before the Honorable Ivan D. Davis. *See* Dkt 5. His preliminary hearing and detention hearing were ultimately scheduled for November 8, 2024, before Judge Davis. At the hearing, the defendant argued that he should be released to his father, who had agreed to serve as a third-party custodian. The government objected and the court ordered the defendant detained. *See* Dkt. 18. On January 8, 2025, a grand jury in the Eastern District of Virginia returned a single-count Indictment, charging the defendant with engaging in illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c), (g)(2), and (f).[6] On March 3, 2024, the defendant filed his motion to revoke the detention order.

## LEGAL FRAMEWORK

A defendant ordered detained by a United States Magistrate Judge may, by motion, seek amendment or revocation of his detention order. *See* 18 U.S.C. § 3145(b). "When the district court acts on a motion to revoke or amend a magistrate judge's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (per curiam) (citing *United States v. Rueben*, 974 F.2d 580, 585–86 (5th Cir. 1992)). Certain offenses provide

---

[6] The Indictment alleges both a completed and attempted violation of 18 U.S.C. § 2423(c), contrary to the defendant's assertion that he is charged only with attempting to violate the statute. *See* Dkt. 38 at 1, 5, and 7.

8

a statutory presumption of detention, including any "offense involving a minor victim under section . . . 2423." 18 U.S.C. § 3142(e)(3)(E); *see also* Dkt. 25 at 1 (charging the defendant with such an offense). When a defendant produces evidence to rebut that presumption, the government must prove by clear and convincing evidence that "no conditions other than detention will reasonably assure the safety of any other person and the community." *United States v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (unpublished).  "With regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence at future court proceedings." *Stewart*, 19 F. App'x at 48.  However, even if rebutted, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *United States v. Ford*, No. 17-20183, 2019 WL 6483413, at *3 (E.D. Mich. July 15, 2019). Indeed, "[t]he presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *Id.*  The factors the court must consider in evaluating release are set forth in 18 U.S.C. § 3142(g) and include:

1) the nature and circumstances of the offense charged;
2) the weight of the evidence against the person;
3) the history and characteristics of the person; and
4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

For the reasons that follow, the Court should find, as did the Honorable Judge Davis and Pretrial Services, that the defendant cannot rebut the presumption against release, but even if he could do so, there are no conditions other than detention that will reasonably assure his appearance at future court proceedings, or the safety of any other person and the community.

## ARGUMENT

**I.     The defendant cannot rebut the presumption against release.**

The defendant's proposed conditions of release, including that he reside with his father and submit to home confinement and electronic monitoring, are insufficient to ensure the safety of the community.

First, the defendant poses a demonstrable risk to at least every minor girl with whom he comes into contact. The defendant messaged frequently with MV1 via WhatsApp and told her he wanted to have sex with her, negotiated how much he would pay her for sex, and provided a meeting location for sex. The defendant messaged with MV1 both when he was in Colombia and when he was in the U.S. The defendant also told law enforcement that he is attracted to minors and has had sex with multiple minor girls during his trips Colombia, including the mother of his two children who live in Colombia. The defendant's history of sex with minors, attempting to pay for sex with a minor, and his admitted attraction to minors means he poses a risk to the community at large, not just in Colombia where he committed the offense. There is no reason to believe his attraction to minors stops at the U.S. border. *Contra* Dkt. 38 at 15 ("The charged conduct relates exclusively to activities and discussions outside the United States" therefore he does not pose "an identified and articulable threat to an individual or the community.").

Second, the defendant poses a serious risk of non-appearance at future court proceedings. He is facing a significant period of incarceration if convicted in this case. Two of his three children reside in Colombia with their mother, and MV1, who may be pregnant with his fourth child, also resides in Colombia. The defendant has built a life in Colombia – he is a resident there, he keeps an apartment there, he travels there often, and his only admitted source of income is there. He has every incentive to flee there if given the opportunity.

The defendant's proposed conditions are insufficient to rebut the presumption that he is a danger and a flight risk because he has shown himself to be a noncompliant, deceptive person—both with law enforcement and with the people who are allegedly closest to him. It is the responsibility of a third-party custodian to report to pretrial any violations of the defendant's conditions of release. The third-party custodian cannot report what the defendant successfully hides from him. In this case, the defendant has successfully hidden many parts of his life from his parents. For example, despite reporting daily contact with his parents, the defendant's parents apparently did not know about his frequent trips to Colombia. *See* Dkt. 12 at 1-2. The defendant's parents told pretrial services that "to their knowledge the most recent overseas trip made by the defendant was Bolivia for his sister's wedding." *Id*. That wedding took place on June 21-22, 2024. The defendant made another 6 trips to Colombia between July 9, 2024, and November 1, 2024. During his law enforcement interview in Miami, the defendant told the agents, "I don't even tell my family what I do most of the time, sometimes. I just, I try to like paint a nice picture, I go to like, you know holidays, but um, I just, I'm just kind of in like a bad . . . every month twice a month I spend all kinds of money . . . I'm all over the place."

Even with a suitable third-party custodian and electronic monitoring, the defendant can find ways of bypassing the monitoring. Obtaining new electronics is cheap and easy, and nearly impossible for a third-party custodian to prevent or monitor. It is not possible to monitor someone 24 hours a day outside of a jail; this is equally true for the defendant's father, no matter how well-intentioned he is. The defendant's father works three days a week. *See* Dkt. 12 at 2. He would not even be able to monitor the defendant's behavior all the time and there is no indication in either the pretrial services report or the defendant's instant motion to indicate whether *all* members of the household would agree to divest of, or password protect, all electronic devices in the home.

Furthermore, it is unclear whether the defendant's father has the technological sophistication to adequately supervise a defendant who is himself technologically savvy and has taken steps to conceal his criminal activities online. Indeed, the defendant has proven himself capable of living a multi-faceted life, keeping the illegal conduct separate and hidden from the rest. He used WhatsApp, an encrypted messaging application, to chat with MV1, and took the further steps of activating disappearing messages to conceal their discussions. He also frequently deleted messages his messages with MV1.

Also troubling are the defendant's finances, which were of concern to both the government and the Court at the November detention hearing, and which are still a mystery despite his recent motion for release. In November 2024, the defendant reported to pretrial services a monthly income of $2,167.00 with expenses of $4,730.00. Dkt. 12 at 3. His only reported liabilities are two loans totaling $4,000, credit card debt of $3,000, and his car. *Id*. at 2-3. He did not report a checking or savings account. His monthly home payment is $2,500, but it is not clear from the bond report if that covers both his home in Virginia and the apartment he rents in Colombia. Notably, the defendant's parents reported they had no knowledge of his finances, though it appears he does receive some financial assistance from them. To what extent they assist is unclear. His employment between July 2024 and November 2024 was, according to him, as a part-time trumpet player with a mariachi band. *See* Dkt. 12 at 2. And yet, the defendant made 6 international trips during that timeframe. To be clear, the government did not suggest that it is irresponsible to be a member of a mariachi band. Dkt. 38 at 14. Rather, the government expressed concern, which was shared by the court, that the defendant's real living expenses, which included frequent international travel, so vastly exceeded his income with no explanation as to where the additional monies came from. These conflicting accounts are further evidence of the defendant's lack of candor with

pretrial services (and by extension the Court) and his efforts to take advantage of and leave in the dark his proposed third-party custodian.

The government's concern regarding risk of flight is not based on mere speculation, but rather on the defendant's demonstrated history of not appearing in court when ordered to do so. The defendant was charged in October 2016 with failure to appear in court on a misdemeanor offense. *See* Dkt. 12 at 4. He was convicted of the offense in December 2016, and according to the bond report he did not appear at that hearing, either. *Id*.

In sum, the combination of the nature of the offense, the defendant's strong ties to a foreign country, and his unexplained funding source(s), makes for a serious concern that the defendant is a danger to the community and a risk of non-appearance at future court proceedings. His apparent lack of forthrightness with his own proposed third-party custodian also means that his proposed release conditions cannot rebut the presumption against release. Accordingly, the defendant's motion should be denied.

## II.     Even if the defendant can rebut the presumption, the Section 3142(g) factors weigh strongly in favor of detention.

In consideration of the 18 U.S.C. § 3142(g) factors, there are no conditions other than detention that will reasonably assure the defendant's appearance at future court proceedings, or the safety of any other person and the community.

*<u>Nature and circumstances of the offense and seriousness of danger to the public.</u>* The nature and circumstances of the offense and the nature and seriousness of the danger to any person or the community posed by the defendant's release are serious and weigh in favor of detention. The evidence shows that the defendant had a sexual relationship with a 16-year-old girl, whom he offered to pay between approximately $19 and $72 to have sex with him at a hotel in Colombia. Just a few weeks before he was arrested at Dulles, the defendant discussed with MV1 that she was

pregnant, and he may be the father of her baby. The defendant has admitted to sex with other minor girls in Colombia, as well, including the mother of his two children there. Accordingly, these factors weigh strongly in favor of detention.

*Weight of the evidence.* The weight of the evidence is strong. As stated above, the defendant was border searched at MIA based on his link to an individual suspected of engaging in child sex trafficking. A keyword search in his phone for "minor" produced his chat thread with MV1. The messages with MV1 show that he knew she was a minor, they had a sexual relationship, he knew she was engaged in sex work, and he attempted to pay her to have sex with him at a hotel in Colombia. The defendant ultimately admitted these things and admitted to relationships with other minor girls in Colombia. Law enforcement was able to confirm MV1's age in a Colombian government database. Forensic examination of the defendant's iPhone revealed multiple pictures of MV1, including a topless photo of MV1, and pictures of the defendant and MV1 together. Accordingly, this factor weighs strongly in favor of detention.

*History and characteristics.* The defendant has a history of concealing his illegal conduct and therefore poses a risk to the community. Despite family support in the area, the defendant persisted in this illegal and harmful conduct. And, as stated above, he has a conviction for failure to appear in court on a misdemeanor offense and a 2013 domestic assault and battery charge, for which he received a deferred adjudication. This factor weighs in favor of detention.

The two cases cited by the defendant in support of his motion are each distinct from this case in several key ways. In *United States v. Burgess*, 2:17-CR-153 (E.D. Va. Dec. 19, 2017), the defendant was charged with receipt and possession of child pornography. He was released by the magistrate judge and later by the district court judge based in part on his lack of criminal history (though he did have a conviction for misdemeanor possession of drug paraphernalia), and the fact

14

that, unlike here, there were no allegations of contact offenses against children. 2:17-CR-153, Dkt. 21, at 5 and 8. Burgess also lacked the foreign ties that make this defendant a flight risk. Burgess's pretrial release was revoked, however, when he failed to comply with the condition that he submit to a polygraph examination for the purpose of determining if he had committed any contact offenses in the past. *See* 2:17-CR-153, Dkt. 22 (government's emergency motion to revoke); *see also* Dkt. 28 (petition and order on pretrial release). Burgess was detained at the plea hearing, which took place four days after the government filed its emergency motion to revoke his release. *See* 2:17-CR-153, Dkt. 25, 29, 30.

*United States v. Bendann*, is similarly inapt. In that case, the defendant was released to pretrial supervision based on "evidence of his previous compliance with terms of release, the lack of evidence that he has ever violated a court order, and his clean record." *United States v. Bendann*, 2023 WL 5806108, at *3 (D. Md. Sept. 7, 2023). In this case, the defendant cannot make any of those same claims.

## CONCLUSION

The defendant's illegal conduct is extremely serious. He poses a serious risk of non-appearance at future court proceedings, and he will be a danger to the safety of others and the community if released, no matter how strict the conditions. Accordingly, the government

respectfully requests that the Court deny the defendant's motion and order the defendant be detained pending trial.

          Respectfully submitted,

          Erik S. Siebert
          United States Attorney

By:      /s/
          Lauren Halper
          Laura Withers
          Assistant United States Attorneys
          United States Attorney's Office
          2100 Jamieson Ave.
          Alexandria, Virginia 22314
          Phone: 703-299-3700
          Email: Lauren.Halper@usdoj.gov
          Email: Laura.Withers@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

By:     /s/
    Lauren Halper
    Assistant United States Attorney
    United States Attorney's Office
    2100 Jamieson Ave.
    Alexandria, Virginia 22314
    Phone: 703-299-3700
    Email: Lauren.Halper@usdoj.gov