**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 1:25-cr-00005** |
| **MICHAEL JAIME INOFUENTES,** | ) | **The Honorable Patricia T. Giles** |
| | ) | |
| **Defendant.** | ) | |
| | ) | **Hearing Requested on May 22,** |
| | ) | **2025 at 9:00 A.M.** |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL INOFUENTES'**
**OPPOSED MOTION TO SUPPRESS**

I.  **SUMMARY OF THE ARGUMENT**

Agents at Homeland Security Investigations ("HSI") conducted an unconstitutional, warrantless search of Mr. Inofuentes' iPhone at an international border. To do so, HSI agents used a pre-textual "border search" under the purported auspices of Customs and Border Protection ("CBP") as an investigative shortcut and to sidestep the Fourth Amendment. The end result was an impermissible, warrantless fishing expedition into Mr. Inofuentes' most intimate, personal communications and activities in Colombia.

HSI agents seized and reviewed the contents of Mr. Inofuentes' iPhone as he reentered the United States at Miami International Airport. Before Mr. Inofuentes' arrival in Miami, HSI agents recruited CBP to conduct a "primary inspection" of Mr. Inofuentes so that HSI agents could conduct a purported "border search" of Mr. Inofuentes' iPhone. At the time of the primary inspection, HSI agents lacked any evidence that Mr. Inofuentes was either currently engaged in a crime or otherwise used his iPhone in connection with any crime. Undeterred and apparently

1

unwilling to investigate, HSI agents nonetheless invoked the purported authority of CBP to circumvent the Fourth Amendment and impermissibly search and seize Mr. Inofuentes' iPhone.

HSI agents' iPhone search was an extensive intrusion of Mr. Inofuentes' privacy. HSI agents trawled through Mr. Inofuentes' iPhone and rummaged through his most personal and sensitive communications and photographs. HSI agents then used those same private materials to question Mr. Inofuentes for hours in a failed effort (initially) to charge him with a federal offense for conduct that allegedly occurred in a foreign jurisdiction, Colombia.

This invasive search of Mr. Inofuentes' iPhone was also untethered to the required nexus to the government's traditional interests at the border: protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband. The iPhone search was instead conducted based on Mr. Inofuentes' isolated dealings with another individual ("Person-1") that was connected to a sex-trafficking investigation. Those dealings involved five Western Union payments from October 2023 (the "Payments"), for which HSI had no information or surrounding context from any source. Indeed, the government had no reporting in its possession about either the relationship between Mr. Inofuentes and Person-1 or the purpose of the Payments. As a result, the government has been forced to concede that Person-1 is not a co-conspirator of Mr. Inofuentes.

The stated justification for the iPhone search therefore rests on HSI agents' desire to pry into Mr. Inofuentes' private communications to glean insight into his activities in Colombia. This "evidence collection" justification is too attenuated from the government's traditional interests at the border to justify the iPhone search.

Even more, HSI agents' reasonable suspicion that Mr. Inofuentes was committing a border-related offense was stale at the time of the iPhone search. As noted, the sole justification for the

iPhone search rests on the Payments from October **2023**.  Reasonable suspicion cannot survive the one-year gap between October 2023 and the iPhone search in November 2024.  And the HSI agents took no steps to develop any facts to revive it.  Instead, the HSI agents sought to search first and investigate later.  In doing so, the HSI agents turned the Fourth Amendment on its head.

The Court should therefore find that the search of Mr. Inofuentes' iPhone was unreasonable and therefore violated the Fourth Amendment.  As such, the Court should suppress all evidence unlawfully obtained and derived from the purported border search.

II.    **BACKGROUND**

Mr. Inofuentes is a resident of District and a citizen of the United States.  The parties generally agree that Mr. Inofuentes has an apartment in Medellin and supports two minor children in the area, as well as his minor child in the District.  Over the years, Mr. Inofuentes has been subject to routine inspections by CBP in the course of his travel between Colombia and the United States.  *See* Ex 1.

On November 1, 2024, Mr. Inofuentes was targeted for a border search by HSI agents at Miami International Airport upon his return from Medellin, Colombia and continued travel to Dulles Airport in the District.  *See* Ex. 1 at 23. Before his arrival in Miami, HSI agents had instructed CBP to detain Mr. Inofuentes for a purported inspection so that HSI agents could conduct a border search of Mr. Inofuentes' electronic devices, including his iPhone ("iPhone Search").  *See* Ex. 2 at US-00000020 (reciting how "HSI Miami conducted a border search of Inofuentes").

The justification for the iPhone Search rests solely on the Payments:  five wire transfers from Mr. Inofuentes to another individual ("Person-1") involved in a sex trafficking investigation.  Person-1 has not been charged in the sex-trafficking investigation.  These five transfers were

between the amounts of $13 and $35 and between the dates of October 17, 2023 and October 25, 2023, more than one year before Mr. Inofuentes' detention in Miami.  Ex. 2 at 19.

At the time of the iPhone Search, HSI agents possessed no other information connecting Mr. Inofuentes to Person-1.  HSI agents did not possess any communications between Person-1 and Mr. Inofuentes.  Nor did HSI agents possess any statements from anyone about the relationship between Person-1 and Mr. Inofuentes.  In fact, at the initial detention hearing, the testifying agent had disavowed any connection between the Payments and the charge in this case.  *See* Ex. 3, Nov. 8, 2024 Hearing, Tr. at 10:14-11:1.  Since then, the government has disclaimed an argument that Person-1 was a co-conspirator of Mr. Inofuentes.

Similarly, HSI agents did not possess any evidence whatsoever regarding the purpose of the Payments.  Thus, the only evidence that HSI had connecting Mr. Inofuentes to Person-1 was the existence of the Payments.  *See* Ex. 2.

More importantly, HSI agents possessed no information that Mr. Inofuentes was currently engaging in suspected criminal activity, had any contact with Person-1 after October 2023, was engaging in any criminal activity after October 2023, or otherwise used his iPhone at any point to communicate with anyone in connection with any suspected wrongdoing.

If HSI agents had actually investigated Mr. Inofuentes' connection to Person-1, they would have learned that the Payments had nothing to do with any impermissible conduct at all.  The Payments were instead for the purpose of assisting Person-1 with moving costs and for food.  By way of example, on October 17, 2023 (the day of the first Payment), Person-1 messaged Mr. Inofuentes the following message (roughly translated from Spanish to English):  "Love, please do me a favor and send me a bit of money as the gas ran out and I have no way to cook.  I woke up without gas." Ex. 4 at 1.  That same message then contains a screenshot of Mr. Inofuentes' receipt

for this October 17, 2023 Payment. Ex. 4 at 2. There is zero illegality as to any of the Payments. Mr. Inofuentes told HSI agents as much during his custodial interrogation in Miami.

Nonetheless, after Mr. Inofuentes was stopped for a primary inspection by CBP at HSI's request, he was superficially questioned by CBP about his travel from Medellin. He stated that he was returning from a four-day trip to Medellin to visit his children who live in Colombia. *See* Ex. 1.

No report of interview has been provided by the government indicating that any of Mr. Inofuentes' actions or statements in the primary inspection before the iPhone Search gave rise to any additional suspicion of Mr. Inofuentes. There is no indication in any reports of interview that the primary inspection by CBP involved any questions of Mr. Inofuentes relating to either the Payments or his relationship to Person-1. Nor is there any indication that the primary inspection involved any questions of Mr. Inofuentes about any suspected improper activities in Colombia. Further, there is no indication that Mr. Inofuentes was questioned at all about any issues relating to border protection, such as possession of contraband, import offenses or possession of contraband. Indeed, the nature of the inspection leading up to the iPhone Search stands in stark contrast with the nature of the other inspections by CBP of Mr. Inofuentes. *Compare* Ex. 1 at 1 ("100% baggage exam was negative for currency, drugs, contraband") *with id.* at 23 ("Miami HSI airport group was on site and conducted a [purported] basic media inspection of subjects [sic] electronic devices with the assistance of MIA HTU").

CBP's primary inspection of Mr. Inofuentes was therefore pretextual and orchestrated by HSI agents in advance of Mr. Inofuentes' arrival in Miami and for one reason: to search and seize Mr. Inofuentes' electronic devices without a warrant. *See* Ex. 1.

During CBP's pretextual inspection of Mr. Inofuentes, HSI agents conducted the iPhone Search. *See* Ex. 1. The iPhone Seach included, at a minimum, HSI Agents scouring the messaging platforms on Mr. Infuentes' iPhone, reviewing an untold number of messages, and reviewing the photographs on Mr. Inofuentes' iPhone. HSI conducted the iPhone Search outside the presence of Mr. Inofuentes.

There is no record in discovery in this case indicating: (1) how long HSI agents searched the iPhone; (2) what search terms they used to search the iPhone (beyond the Spanish words for "age" and "minor"); and (3) what content agents looked at (or didn't look at). During its black-box review of Mr. Inofuentes' phone, HSI agents uncovered Mr. Inofuentes' WhatsApp communications with Individual-1.

Based on the messages and photographs reviewed during the iPhone Search, HSI agents questioned Mr. Inofuentes for hours in Miami about the most intimate details of his life: his family history, relationship history, sexual proclivities, sexual history, relationship with Individual-1, and various other topics. In the course of this interview, agents relied heavily on, and questioned Mr. Inofuentes extensively about, messages and photographs reviewed during the iPhone Search. In doing so, HSI agents repeatedly and falsely represented to Mr. Inofuentes that their interview of him was solely a "box checking" exercise and that as soon as Mr. Inofuentes' answered their questions, he could return to his travels.

After the iPhone Search and in and around the time of Mr. Inofuentes' multi-hour interview, HSI agents attempted to charge Mr. Inofuentes with a federal offense. An AUSA (presumably at the United States Attorney's Office for the Southern District of Florida) declined federal prosecution, pending further investigation. *See* Ex. 1 HSI agents seized Mr. Inofuentes' iPhone

and other electronic devices and allowed Mr. Inofuentes to continue his travels to Dulles Airport. *See* Ex. 5.

On November 4, 2024, HSI agents in Miami alerted HSI agents in this District that Mr. Inofuentes was returning to Colombia and again requested his stop and questioning on his outbound flight from Dulles Airport. Following that interview, Mr. Inofuentes was arrested, and this case was initiated. On November 5, 2024, HSI requested a forensic examination of Mr. Inofuentes' iPhone that was searched and seized at Miami International Airport. *See* Ex. 6.

On November 12, 2024, the Honorable Lindsey R. Vaala approved a warrant for Mr. Inofuentes' iPhone based largely on the private messages uncovered in the iPhone Search. On March 14, 2025, the Honorable William Fitzpatrick approved a warrant for Mr. Inofuentes' iCloud account based on the same.

### III.  LEGAL STANDARD

The Fourth Amendment safeguards "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment plainly requires that searches and seizures by the government be reasonable. *See Bingham City v. Stuart*, 547 U.S. 398, 403 (2006). When analyzing the reasonableness of a search, courts balance the "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); *accord Samson v. California*, 547 U.S. 843, 848 (2006). In most cases, reasonableness requires a warrant, unless the search falls within a specific exception to the warrant requirement. *See United States v. Aigbekaen*, 943 F.3d 713, 720 (4th Cir. 2019).

One such exception to the warrant requirement applies at our nation's borders. *See id*. at 720. Searches at the border historically have been justified based on the government's sovereign

interests in "protecting national security, collecting or regulating duties, blocking entry [of a prohibited person], or excluding contraband." *Id*. at 721. Indeed, the heart of the border search involves "stopping and examining persons and property crossing into the country" to "prevent[] the entry of unwanted persons and effects." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Even so, a search at the border – like any other – must be reasonable. *See, e.g.*, *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (reciting how the border search exception "does not mean that at the border anything goes") (cleaned up); *see also United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (highlighting how courts should conduct a balancing test in which "the offensiveness of the intrusion must be weighed against the level of warranted suspicion").

A border search must therefore be tethered to its "well-established justifications." *Aigbekaen*, 943 F.3d at 721. A routine search at the border "of the persons and effects of entrants" does not require a warrant or even individualized suspicion. *Montoya de Hernandez*, 473 U.S. at 538; *United States v. Nkongho*, 107 F.4th 373, 381 (4th Cir. 2024). A non-routine, invasive border search, at a minimum, "must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Aigbekaen*, 943 F.3d at 721. The Fourth Circuit has not squarely decided whether "reasonable suspicion is enough to justify a forensic [non-routine, invasive] search or whether probable cause is required." *Nkongho*, 107 F.4th at 382 (declining to address whether the district court properly applied a "reasonable suspicion standard" to the seizure of an iPhone at the border).

A non-routine, invasive search cannot be justified at the border if it becomes "too 'attenuated' from these historical rationales" justifying border searches. *Aigbekaen*, 943 F.3d at 721. The government may not, for example, invoke "the border exception on behalf of its

generalized interest in law enforcement and combatting crime." *Id*. at 720 (citing *United States v. Kolsuz*, 890 F.3d 133, 143 (4th. Cir. 2018)).  If so invoked, the search will be generally unconstitutional, unless supported by a warrant or based on another exception to the requirement. *See Aigbekaen*, 943 F.3d at 720.

IV.    **LEGAL ARGUMENT**

   a.    **Given the private, personal communications and effects on his iPhone, Mr. Inofuentes' privacy interest in his iPhone was high such that the iPhone Search was invasive.**

It cannot be reasonably disputed that Mr. Inofuentes' privacy interest in his iPhone was high, and the iPhone Search was non-routine and invasive.  Mr. Inofuentes' iPhone contained a breadth of private communications, photographs, and other intimate details about Mr. Inofuentes' personal and private life.  Indeed, it was precisely these intimate, private details that HSI agents sought to review in a warrantless fishing expedition by orchestrating Mr. Inofuentes' pretextual "primary inspection."

Border agents require neither a warrant nor reasonable suspicion to conduct "routine searches of the persons and effects of entrants."  *Nkongho*, 107 F.4th at 381 (citing *Montoya de Hernandez*, 473 U.S. at 538).  Such routine searches by border agents have traditionally included searches of a traveler's luggage or outer clothing.  *See, e.g.*, *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971); *see also United States v. Ramsey*, 431 U.S. 606, 620 (1977) (highlighting examples of routine border searches, including searches of outer clothing and luggage); *accord United States v. Asbury*, 586 F.2d 973, 975-76 (2d Cir. 1978) (explaining further how a routine border search of a person's belongings includes searches of outer clothing, luggage, a purse, wallet, pockets or shoes).  "[T]he level of intrusion into a person's privacy is what

determines whether a border search is routine" and, by extension, whether the border search exception applies or not. *Irving*, 452 F.3d at 123.

The Supreme Court has also highlighted how "cell phones differ in both a quantitative and qualitative sense from other objects" that might be searched by law enforcement. *Riley v. California*, 573 U.S. 373, 393 (2014). In other words, a cellphone, according to the Supreme Court, is categorically different from the physical objects of an individual. *Id.* (explaining how a cell phone, even back in 2014, is essentially a "minicomputer" with "immense storage capacity"). In contrasting the difference between a search of physical property and a cellphone, the Court explained:

> The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information — an address, a note, a prescription, a bank statement, a video — that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.

*Id.* at 394-95.

Other decisions since *Riley* underscore the extraordinary privacy concerns implicated by searches of electronic devices. *See, e.g.*, *United States v. Smith*, 967 F.3d 198, 208 (2d Cir. 2020) (highlighting how the search of a cellphone "implicates different privacy and possessory concerns than the search and seizure of a person's ordinary personal effects"); *accord United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016) (explaining how a cell phone holds a "vast trove of

personal information"). Indeed, "reviewing the information in a person's cell phone is the best approximation government officials have for mindreading." *United States v. Sultanov*, 742 F. Supp. 3d 258, 286 (E.D.N.Y. 2024). Taken together, government intrusion into an individual's cellphone provides "a kaleidoscopic view of the user's whole life." *Id.*

The Fourth Circuit follows *Riley* in recognizing how cellphones contain "the sum" of a traveler's private life. *Nkongho*, 107 F.4th at 381 (citing *Riley*, 573 U.S. at 394). Indeed, a cellphone contains "unusually sensitive data regarding one's relationships, personal interests and preferences, prior internet searches, location history, and much more." *Nkongho*, 107 F.4th at 381 (citing *Aigbekaen*, 943 F.3d at 723). For that reason, the Fourth Circuit found that a forensic search of a cellphone was a non-routine, invasive search. *Nkongho*, 107 F.4th at 382. As such, the Fourth Circuit will only countenance such a search in "limited circumstances." *Id.; see infra* (discussing those circumstances).

In light of the above authority, HSI agents' search of Mr. Inofuentes' cellphone was non-routine and a substantial invasion of Mr. Inofuentes' privacy. *Riley* compels the conclusion that the iPhone Search was not the equivalent of a routine search of a purse or luggage or outer clothing. *See, e.g.*, Ex. 1 at 1, 4, 6, 8, 11, 13, 15, 17, 19 (describing CBP's routine searches of Mr. Inofuentes baggage for drugs, currency and contraband). As noted above, HSI agents reviewed the "kaleidoscope" of Mr. Inofuentes' personal life and revealed details that had previously been private. HSI agents reviewed Mr. Inofuentes' messaging platforms, including his WhatsApp messages, and trawled through his personal communications with his associates, including Individual-1. HSI agents also rummaged through his personal photographs. So too did they view his contacts. Mr. Inofuentes does not know the full extent of the iPhone Search because HSI Agents did not memorialize in any report the steps taken to execute the iPhone Search.

11

Nonetheless, reviewing intimate, private conversations and scrolling through his personal photographs is an unqualified, substantial invasion of Mr. Inofuentes' privacy. *See, e.g.*, *Nkongho*, 107 F.4th at 381 (citing *Aigbekaen*, 943 F.3d at 723).

While the *Nkongho* decision was limited to a "forensic" search of a cellphone, not a "manual" search of a cellphone like the iPhone Search, that distinction has no difference in light of the reasoning in *Riley*.[1]    Indeed, the at-issue searches in *Riley* were manual searches, and the Court did not hesitate in requiring a warrant. *See* 573 U.S. at 379-80.    Indeed, even with a manual search, the government can access and review a trove of intimate and personal information that reflects an "extraordinary invasion of a traveler's privacy." *Sultanov*, 742 F. Supp. 3d 258, 286 (E.D.N.Y. 2024).    Indeed, it is obvious from CBP's own records how the iPhone search was qualitatively different from CBP's numerous routine inspections of Mr. Inofuentes' baggage for prohibited items. *Compare* Ex. 1 at 1, 4, 6, 8, 11, 13, 15, 17, 19 (describing CBP's routine searches of Mr. Inofuentes baggage for drugs, currency and contraband) *with id.* at 23 (describing the iPhone Search conducted by HSI).    A baggage search for contraband is both expected, routine and non-invasive.    The iPhone Search is none of those things.

Even more, courts have recently rejected any distinction between a manual and forensic search for purposes of a border search, as both substantially invade a traveler's privacy.    The court in *Sultanov*, for example, rejected arguments that government officials may have unfettered access to an individual's cell phone as long as that search was a "manual search." *Id*. at 288.    The court

---

[1] A manual search of an iPhone involves an agent searching and reviewing the contents of an iPhone by hand, without the aid of external equipment.    A forensic search, by contrast, is a "powerful tool" that enables law enforcement to access additional material. *See Nkongho*, 107 F.4th at 381 (explaining how a forensic search can reveal not only data "that a user has intentionally saved on a digital device, but also [can unlock] password-protected files, restor[e] deleted material, and retriev[e] images viewed on websites").

reasoned that the privacy intrusion of a cellphone search at the border is "substantially the same, for Fourth Amendment purposes, as the privacy intrusion of a forensic search." *Id.* at 288. The court also highlighted how the *Riley* decision "did not turn on the method used to search a cell phone's contents and, in fact, held that the exact same manual cell phone searches at issue here were not exempted from the warrant requirement. *Id.* at 289 (citing *Riley* at 378-79, 386).

Put simply, "the distinction between manual and forensic searches is too flimsy a hook on which to hang a categorical exemption to the Fourth Amendment's warrant requirement." *Id.* at 290. Other decisions are in accord. *See also United States v. Gavino*, No. 22-CR-136, 2024 U.S. Dist. LEXIS 3120, at *13 (E.D.N.Y. Jan. 7, 2024) (explaining that *Riley* "establishes that even manual cell phone searches are intrusive"); *accord United States v. Alisigwe*, No. 22-CR-425, 2023 U.S. Dist. LEXIS 213415, at *12 (S.D.N.Y. Nov. 30, 2023) (finding as non-routine a "manual review of the contents of a person's cellphone [because it] is on the 'more invasive' end of the search spectrum").

The Court should therefore view the iPhone Search for what it was: a non-routine, invasive search. Whether the iPhone Search was a manual search or forensic search makes no difference for purposes of the Fourth Amendment. As *Riley* explained, the "the Founders did not fight a revolution to gain the right to government agency protocols." *Riley*, 573 U.S. at 398.

b. **The government's justification for the iPhone Search lacked the requisite connection to the traditional border-search justifications.**

Given the invasive nature of the iPhone Search, the government must show that it had reasonable suspicion that Mr. Inofuentes committed an offense that "bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Nkongho*, 107 F.4th at 382 (citing *Aigbekaen*, 943 F.3d at 721). It cannot.

13

The Fourth Circuit has struck down non-routine, invasive cell-phone searches where the justification for doing so was untethered from government's traditional border interests.   In *Aigbekaen*, the Fourth Circuit held that a non-routine, invasive cellphone search at the border violated the Fourth Amendment because the justification for the search did not bear a sufficient "nexus" to the "purposes of the border search."   943 F.3d at 723. In doing so, the Court started from the premise that the "border search" exception to the warrant requirement is broad but "not boundless."   *Id*. at 720.   And, in light of *Riley,* the Fourth Circuit reasoned that the non-routine, invasive search must be tethered to the "justifications underlying it."   *Id.*   If a non-routine, invasive search at the border is too "attenuated" from those historical rationales, then the search will be unconstitutional unless accompanied by a warrant or otherwise justified by a different warrant-requirement exception.   *Id.* at 721.

By extension, the Fourth Circuit instructed that the government "may not invoke the border exception on behalf of its generalized interest in law enforcement and combatting crime."   *Id.* at 721 (citing *Kolsuz*, 890 F.3d at 143).   This warning is especially apt as applied to searches of cellphones, which "store vast quantities of uniquely sensitive and intimate personal information." *Aigbekaen*, 943 F.3d at 721 (citing *Riley*, 573 U.S. at 393-97).

In light of these principles, the *Aigbekaen* court rejected as unconstitutional a border search of a cellphone where the justification for the search was "entirely unmoored from the Government's sovereign interests in protecting national security, collecting or regulating duties, blocking [the defendant's]] own entry or excluding contraband."   943 F.3d at 721.   The government's justification of probable cause that the defendant committed "grave *domestic*" crimes, according to the Fourth Circuit, lacked the "requisite nexus to the recognized historical rationales" justifying the border search exception.   *Id.*   Put simply, the Fourth Circuit explained

that "it would be patently unreasonable to permit highly intrusive forensic Government searches of travelers' digital devices, without warrants, on bases unrelated to the United States's sovereign authority over its borders." *Id.* at 722  (instructing further that the government cannot justify such a search based on either a "general interest in combatting crime" or where the "suspected offenses have little or nothing to do with the border").

The Fourth Circuit reaffirmed these principles in *Nkongho*, and underscored how non-routine, invasive searches at the border are justified only in "limited circumstances."  107 F.4th at 382.  Such a search must therefore be based on the dual requirement of "individualized suspicion" and "transnational nexus requirement" so that the resulting search is "tethered to the rationale behind the border exception." *Id.*  Because the *Nkongho* defendant was involved in a "munitions export scheme" that "goes to the heart of the border search exception," the court upheld the government's search of the defendant's cellphone under the border-search exception. *Id.* at 383.

HSI agents' justification for the iPhone Search was untethered from the "recognized historic rationales" for the border-search exception.  *Aigbekaen*, 943 F.3d at 721.  The iPhone Search had nothing to do with "protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Nkongho*, 107 F.4th at 382.

HSI agents instead orchestrated the iPhone Search because the agents wanted to pry into Mr. Inofuentes' personal and intimate communications and effects as part of a fishing expedition into his activities in Colombia, all without conducting an actual investigation of Mr. Inofuentes. At the time of the iPhone Search, the government had in its possession no evidence that Mr. Inofuentes' himself was engaging in an international crime.  The government has conceded that Person-1 was not a co-conspirator of Mr. Inofuentes. *Cf. Nkongho*, 107 F.4th at 383 (highlighting

how agents "were aware of [the defendant's] role in the conspiracy" and "knew that [the defendant] was part of the conspiracy"). As such, it cannot use Mr. Inofuentes' isolated contact with Person-1 from October 2023 as a means to bootstrap and sidestep the required individualized suspicion as to Mr. Inofuentes. *Id.*

The alleged crime conducted by Person-1 (while serious) does also not bear the requisite relationship to the enumerated justifications for the border-search exception. *Cf. Nkongho,* 107 F.4th at 382-83 (highlighting how the agents had probable cause that the defendant was engaged in a "munitions export conspiracy" that "goes to the heart of the border search exception"). Without more, the government's justification for the iPhone Search is based only on its generalized interest in "combatting crime." *Aigbekaen*, 943 F.3d at 722. This justification is "patently" insufficient. *Id.*

Further, in orchestrating the iPhone Search, the HSI agents took no steps to develop evidence that Mr. Inofuentes was engaging in the specific offenses that justify the border-search exception. As noted above, the agents had no evidence that Mr. Inofuentes was currently engaging in any offense related to historical justifications for the border search. And HSI agents took no effort to develop such evidence before the iPhone Search. At the onset of the primary inspection that led to the iPhone Search, agents made no known inquiry into Mr. Inofuentes' possession of contraband, did not discuss with him any issues relating to duties or ask him any predicate questions relating to national security or import/export schemes. Nor did the agents discover in a routine search of Mr. Inofuentes any evidence that would justify the more invasive iPhone Search. *Cf. Kolsuz* 890 F.3d at 143. Indeed, HSI agents did not even ask Mr. Inofuentes about the Payments – or even his dealings with Person-1 – until *after* conducting the iPhone Search.

16

As such, HSI agents entirely skipped over the evidentiary hooks that would justify such a non-routine, invasive search. For this reason, the primary inspection of Mr. Inofuentes was pretextual. Indeed, HSI agents orchestrated the iPhone Search even before Mr. Inofuentes arrived in Miami and planned in advance to sidestep the warrant requirement based only on Mr. Inofuentes' location at the border. *See Aigbekaen*, 943 F.3d at 722 (rejecting the principle that a non-routine, invasive search can be justified based only on the search's "physical and temporal proximity to an international border" and instructing how the search must be justified not on the location of the search but on the tethering to the government's "*sovereign interests*") (emphasis in original).

In short, HSI agents intentionally sought to circumvent the Fourth Amendment's warrant requirement. At the time of the iPhone Search, HSI agents had taken no investigatory steps that would justify a proper search warrant for Mr. Inofuentes' iPhone. HSI agents lacked both probable cause that Mr. Inofuentes was engaging in a crime and had no information that Mr. Inofuentes' iPhone had evidence of any crime (or was even used to communicate with anyone suspected of a crime).

Instead of collecting such evidence in an actual investigation and then applying for a warrant once they had investigated the suspected offenses, HSI agents took a short cut. HSI Agents saw that Mr. Inofuentes was arriving at an international border in Miami. And HSI agents used that location – and the purported authority of CBP – to shirk the warrant requirement and impermissibly conduct the iPhone Search. *See id*. at 722.

Because the iPhone Search was untethered from the enumerated, traditional justifications for a non-routine, invasive border search, it cannot be justified by the border-search exception and violated the Fourth Amendment. *See id*. at 723.

> c. **The government lacked the requisite reasonable suspicion of a traditional border offense.**

Even if the HSI agents had any justification for the iPhone Search that was tied to the above-mentioned historical and traditional justifications underpinning a border search, the iPhone search was nonetheless impermissible for a separate reason: there was no reasonable suspicion to conduct the iPhone Search. Quite the opposite, the stated reasonable suspicion as to the Payments from *October 2023* was stale after the passage of more than a year at the time of the iPhone Search in November 2024.

Reasonable suspicion is not a perpetual concept; it goes stale. Judge Nachmanoff's decision in *Irshaid, et al. v. Garland*, No. 1:24-cv-10405-MSN-WPB, 2025 U.S. Dist. LEXIS 43254 (E.D. Va. Mar. 10, 2025) is instructive. In *Irshaid*, the plaintiffs challenged, as relevant here, as unconstitutional the search of a cellphone at the border without reasonable suspicion. *See id*. at *15. CBP had conducted a border search of the plaintiff's phone based on the plaintiff's inclusion on the terrorist watch list in and around early 2024. *See id*. at *4. In surveying both *Aigbekaen* and *Nkongho*, the court agreed that plaintiffs had adequately alleged an impermissible search. As the court noted, reasonable suspicion requires a showing that agents "possess[ed] 'a reasonable and articulable suspicion that the person seized *is* engaged in criminal activity.'" *Id*. at *19 (citing *Reid v. Georgia*, 448 U.S. 438, 440) (emphasis in original). At best, inclusion of the plaintiff on the terrorist watch list raised the inference that the required reasonable suspicion existed "at and around the time of the nomination [on the list] – not months or years later." *Irshaid*, 2025 U.S. Dist. LEXIS 43254 at *32. Put another way, reasonable suspicion from early 2024 was no longer valid in June and August 2024 to justify an invasive border search. *Id*. at **4, 17, 19.

Other decisions from the around the country are in accord. In *United States v. Greene*, No. 1:12-CR-129-14, 2014 U.S. Dist. LEXIS 60514 (E.D. Tenn. Jan 15, 2013) the court held that the

officer had no reasonable suspicion to stop a defendant on the basis for driving on a suspended license. *Id*. at **3-4. The court reasoned that the officer's knowledge of the defendant's history of driving on a suspended license 160 days before the at-issue stop "was too stale to justify . . . a belief that a suspicion was still in effect." *Id*. at *13. This gap between the suspected offense and the stop based on that offense was too "significant [a] time period" for purposes of the Fourth Amendment. *Id.* The Tenth Circuit in *United States v. Laughrin*, 438 F.3d 1245, 1248 (10th Cir. 2006) similarly found that the passage of 22 weeks before the conduct that led to the basis of a stop could not justify reasonable suspicion. The Tenth Circuit also explained that such a passage of time was "too stale" for purposes of reasonable suspicion. *Id.*

The approximate one-year gap in time between the Payments in October 2023 and the iPhone Search in November 2024 far surpasses what the above-referenced decisions have already found to be stale for purposes of reasonable suspicion. The same conclusion holds here.

HSI agents had no information about Mr. Inofuentes that implicated him in anything after October 2023. HSI agents had no information about any individual detailing the purpose of the Payments. Even more, HSI agents had no information from any individual that Mr. Inofuentes was committing a crime in October 2023 or at any time thereafter. Instead, agents had just five discrete payments in time with no context and no evidence of any contact or payment outside of October 2023. Even assuming agents had reasonable suspicion to believe that Mr. Inofuentes was committing an offense in October 2023, there was nothing to indicate the same one year later in November 2024. *Irshaid*, 2025 U.S. Dist. LEXIS 43254 at *19.

Further, the HSI agents took no effort to "improve upon" the threadbare connection of Mr. Inofuentes to any crime. *See, e.g., United States v. Benavides*, 291 Fed. App'x 603, 606 (5th Cir. 2008) (finding no reasonable suspicion because of stale information for which agents took no steps

to refresh).  CBP agents took no steps to identify any facts that would give rise to any indication that Mr. Inofuentes was currently engaging in any wrongdoing.  Prior to the iPhone Search, CBP agents did not observe anything unusual about Mr. Inofuentes' behavior such that a primary inspection was appropriate.  Nor did any CBP agent discover anything in the course of a routine search of Mr. Inofuentes' physical possessions, such as his luggage or personal effects, that raised suspicions necessary to elevate a routine search to a non-routine search.  Nor did they ask any questions of him about any suspected unlawful activities in Colombia.  Nor did they ask him any questions about the payments to Person-1 or his dealings with Person-1.

It was only *after* HSI agents invoked CBP's authority to conduct the iPhone Search and after HSI agents had trawled through his most intimate and personal messages and photographs, that HSI did anything to investigate the purported suspicion that led to Mr. Inofuentes stop.  Indeed, this was HSI's plan all along:  search the iPhone first and ask questions later.  In doing so, the HSI agents flipped the Fourth Amendment on its head.

Had HSI agents actually investigated Mr. Inofuentes in a permissible manner, they would have learned that the Payments had nothing to do with any impermissible conduct at all.  Indeed, Mr. Inofuentes had a pre-existing relationship with Person-1 that had nothing to do with any illegality.  The Payments were instead for the purpose of assisting Person-1 with moving costs and for food.  Just by way of one example, on October 17, 2023 (the day of the first Payment), Person-1 messaged Mr. Inofuentes the following rough message (translated from Spanish to English):  "Love, if you are going to be sending me something, I have run out of gas and I have no way to help.  I woke up without gas."  That same message then contains a screenshot of Mr. Inofuentes' receipt for this October 17, 2023 Payment.  Ex. 4 at 2.  These Payments are innocent.

Because HSI agents eschewed their investigative function and sought instead to conduct a fishing expedition through the iPhone Search, their reasonable suspicion was stale and is plainly refuted by the record.

> d. **Because the iPhone Search violated the Fourth Amendment, suppression is required.**

For the above-stated reasons, the iPhone Search was a non-routine, invasive search that was untethered from the traditional, enumerated justifications for a border search. As such, it violated the Fourth Amendment. The appropriate remedy is therefore the exclusion of the evidence obtained in the iPhone Search as well as all evidence obtained directly obtained from that unlawful search: the fruits of the poisonous tree. *See, e.g.*, *United States v. Terry*, 909 F.3d 716, 721 (4th Cir. 2018). Those fruits include the evidence that was obtained as a direct result of the impermissibly obtained messages and photos from the iPhone Search, including Mr. Inofuentes' statements about those messages in custodial interviews with HSI agents, and electronic evidence obtained from search warrants that are based on those same messages. *Id.* at 721-23.

Suppression is the appropriate remedy. On the heels of the iPhone Search, agents sought and obtained search warrants for Mr. Inofuentes' electronic devices, including a warrant for the same iPhone that was subject to the iPhone Search. In applying for those warrants, agents relied heavily upon the messages from the impermissible iPhone Search, such that there is a direct link (both substantively and temporally) between the impermissible iPhone Search and the search warrant returns for Mr. Inofuentes' electronic devices (and later his iCloud account). *Id.* at 721.

Even more, suppression is warranted in this case because of the need to deter the underlying agent conduct. As noted above, HSI agents did almost nothing to investigate Mr. Inofuentes, despite an ability to do so. Mr. Inofuentes was in the United States, and HSI agents could have (1) interviewed him at any point prior to the iPhone Search; (2) collected *any* evidence by *any* means

that would prove or, in this case, disprove an improper connection to Person-1; and (3) attempted to collect his electronic messages through established means, including a search warrant, assuming *arguendo* any factual predication. HSI agents intentionally did none of these things. Had HSI agents done even a basic investigation, they would have discovered that Mr. Inofuentes' payments to Person-1 were entirely innocent and had no connection to any sex-trafficking investigation.

HSI agents instead sought to circumvent the probable cause and warrant requirement that would otherwise attach to Mr. Inofuentes' iPhone because it was expedient for them. Without conducting any investigation, HSI agents orchestrated the iPhone Search and invoked the authority of CBP in order to take an investigative short cut. And they did so based on Mr. Inofuentes' improvident arrival at an international border. *See, e.g.*, *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (reciting how the border search exception "does not mean that at the border anything goes") (cleaned up). Indeed, HSI agents did not even seek to "improve" the non-existent reasonable suspicion of Mr. Inofuentes in the pre-textual primary inspection before jumping straight to the iPhone Search.

This agent conduct runs afoul of basic Constitutional rights and must be deterred. The border-search doctrine was not intended to be a shortcut for unenterprising federal agents to set traps for citizens returning from abroad. Even more, agents did not reveal to the respective magistrate judges the totality of the circumstances around the iPhone Search in affidavits for the subsequent search warrants for Mr. Inofuentes' electronic devices. *See, e.g.*, *United States v. Fox*, 23-CR-227, 2024 U.S. Dist. LEXIS 130886, at *14 (E.D.N.Y. July 24, 2024) (excluding evidence collected from an impermissible, manual border search of a cellphone to deter agent conduct and finding that subsequent warrants did not cure the taint).

As such, the "taint" of the iPhone Search is not purged by the HSI agents' subsequent attempts to whitewash the Fourth Amendment violation through subsequent warrant applicants. Quite the contrary, the contents derived from the iPhone Search permeate every step of the agents' evidence-collection steps after Mr. Inofuentes' arrival in Miami.

## V. CONCLUSION

The Court should therefore grant this Motion for the above-stated reasons.


Dated:  April 17, 2025                    Respectfully submitted,

                                          MICHAEL JAIME INOFUENTES
                                          By Counsel

                                          /s/
                                          _____
                                          Nina J. Ginsberg, Esquire
                                          Virginia State Bar No. 19472
                                          Greenspun Shapiro Ginsberg & Yang PC
                                          3955 Chain Bridge Rd., Fl. 2
                                          Fairfax, VA 22030
                                          Phone: (703) 352-0100
                                          Fax: (703) 591-7268
                                          Email:  njg@greenspunlaw.com

                                          Scott Armstrong, Esquire
                                          McGovern Weems, PLLC
                                          1050 15th Street, Suite 1030, NW
                                          Washington, D.C. 20005
                                          DC Bar No. 993851
                                          (admitted *pro hac vice*)
                                          Telephone: (202) 978-1267
                                          Email: scott@mcgovernweems.com

                                          *Counsel for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 17th day of April, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

/s/ _____
Nina J. Ginsberg