IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:25-cr-00005 |
| MICHAEL JAIME INOFUENTES, ) | The Honorable Patricia T. Giles |
| ) | |
| Defendant. ) | |
| ) | Hearing: August 19, 2025 |
| ) | at 10:00 A.M. |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL INOFUENTES'
OPPOSED MOTION TO SUPPRESS HIS CUSTODIAL STATEMENTS**

I. **SUMMARY OF THE ARGUMENT**

During a November 1, 2024, custodial interview at Miami International Airport, agents deceived and coerced Mr. Inofuentes into waiving his *Miranda* rights and continuing to speak with agents in the same interview. As such, Mr. Inofuentes' will was overborne by the agents and his capacity for self-determination critically impaired.

First, agents used deception and coercion to extract an invalid *Miranda* waiver from Mr. Inofuentes. At the start of his custodial interview, when Mr. Inofuentes was attempting to "carefully" review the *Miranda* waiver presented to him, both agents deceived Mr. Inofuentes about the consequences of signing the *Miranda* waiver. Agent Ballard told Mr. Inofuentes that what he was doing was "[f]or [his] protection." TFO Bartos immediately followed up with a similar comment: "Just want to make sure you're protected." Both of these comments were misleading, and tricked Mr. Inofuentes into believing that signing the *Miranda* waiver was for his "protection." The opposite was true. Staying silent was for Mr. Inofuentes' protection. Providing

1

statements to agents who anticipated charging him with a felony – even before the interview began – was not for his "protection." Indeed, the agents' self-serving and misleading legal "advice" contradicted Mr. Inofuentes' *Miranda* rights in a critical way at an even more critical time. Even more, agents misled Mr. Inofuentes about when his *Miranda* rights would be relevant and apply during his interview. Agents explained to Mr. Inofuentes that his *Miranda* rights were relevant to just one line of questioning: his knowledge of drug smuggling. As such, the agents improperly cabined the scope of Mr. Inofuentes' constitutional rights in a way that was designed to deceive him about the scope of his rights and the consequences of relinquishing those rights. As such, the agents fraudulently induced a *Miranda* waiver that was neither knowing nor voluntary.

Second, after the interview commenced, the agents again deceived and coerced Mr. Inofuentes into incriminating himself about a critical issue in this case: his conduct with Individual-1. The agents' deception and coercion contradicted Mr. Inofuentes' *Miranda* rights by (1) telling him that he had to answer their questions and just to "spit it out"; and (2) misleading him about the consequences of his statements with promises of leniency. As to the latter, agents affirmatively misled Mr. Inofuentes by instructing him that his statements were merely part of a "box checking" exercise, that he would be free to leave once he answered their questions, and that he was not in trouble. Each of these statements was false. And each statement was intentionally designed to mislead and coerce Mr. Inofuentes into incriminating himself. The agents' post-waiver conduct thus provides a separate and independent basis for the Court to find a violation of Mr. Inofuentes' Fifth Amendment rights.

In light of the agents' conduct, the Court should suppress Mr. Inofuentes' custodial interview, as well as all evidence derived therefrom.

II.   **LEGAL STANDARD**

A statement made during a custodial interrogation will be suppressed unless the defendant is advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and the defendant "knowingly, intelligently, and voluntarily waives those rights." *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). Whether a defendant waived his Constitutional rights has two "distinct dimensions." *United States v. Christobal*, 293 F.3d 134, 139 (4th Cir. 2002). First, the "relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." *Id*. Second, the "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *Id.* at 140.

Coercive activity is a necessary condition "for a confession or *Miranda* waiver to be considered involuntary." *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017). The coercion must "rise to a level such that 'the defendant's will has been overborne or his capacity for self-determination critically impaired.'" *Id.* at 855 (citation omitted). This analysis turns on the totality of the circumstances, including the characteristics of the defendant, the interview's setting, and the interrogation's details. *Id.* The government "bears the burden of proving by a preponderance of the evidence that the statement was voluntary." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997).

III.     **ARGUMENT**

    a. **Mr. Inofuentes was in custody for purposes of his interview with agents such that *Miranda*'s safeguards apply**

Mr. Inofuentes' interview ("Miami Interview") with agents took place in a controlled-access room to which he was escorted from the secondary-inspection area by agents, from which he was not free to leave, and in which he was never left alone. Given this restriction on his freedom of movement, a reasonable person would not have felt that he or she was free to leave. *Giddins*, 858 F.3d at 879 (citations omitted). As such, there cannot be any reasonable dispute that Mr. Inofuentes was "in custody" for purposes of *Miranda*'s safeguards. *Id.* at 880; *see also United States v. Woodland*, 285 F. Supp. 3d 864, 869-70 (D. Md. 2018); *United States v. Freeman*, 61 F. Supp. 3d 534, 545 (E.D. Va. 2014).

    b. **Agents' deception and coercion of Mr. Inofuentes rendered his statements involuntary**

        i. **Agents fraudulently obtained Mr. Inofuentes' *Miranda* waiver through deceit and misleading statements**

During the Miami Interview, agents obtained a *Miranda* waiver from Mr. Inofuentes that was premised on affirmative misrepresentations about the rights he was surrendering and the legal effect of waiving those rights. This intentional deceit rendered Mr. Inofuentes' relinquishment of his Constitutional rights unknowing and his waiver involuntary. Suppression is therefore warranted.

Agents started the Miami Interview by affirmatively misleading Mr. Inofuentes about the nature of the Interview. Agent Ballard started the Miami Interview by pretending that Mr. Inofuentes was seemingly selected at random and that today was his "lucky day." Ex. 1, Int. Tr. 3:2-4. This was not true. Even before the Miami Interview, Agent Ballard planned for the "potential detention" of Mr. Inofuentes. Ex. 2.

4

Agent Ballard opened the Miami Interview with this misleading theme and repeatedly returned to it: the interview of Mr. Inofuentes was just a "routine" exercise that required his questioning to "kind of just check all those boxes." Int. Tr. 3:8-12. As noted below, Agent Ballard returned to this false premise at critical points of the Interview to fraudulently induce Mr. Inofuentes to incriminate himself.

Against this misleading backdrop, Agent Ballard misrepresented the scope of Mr. Inofuentes' *Miranda* rights in a way calculated to deceive Mr. Inofuentes about his constitutional rights. Agent Ballard specifically misrepresented to Mr. Inofuentes that his *Miranda* rights were applicable only to the forthcoming questions about smuggling drugs:

> Ms. Ballard: And **we want to ask you questions about what you may know, what you may have seen**, if you know of anybody involved in that [smuggling drugs], in order for us to ask you those more specific questions, right? **There's a possibility that you might come out and like word vomit, "I moved drugs," right**?
>
> Mr. Inofuentes: Yeah.
>
> Ms. Ballard: **So because of that, for that reason, before we start that line of questioning**, we want to make sure you understand that **at any point in time of this part**, you can stop. You can say, I don't want to answer that question, or I don't want to answer any questions.
>
> Mr. Inofuentes: I understand.
>
> Ms. Ballard: So we give you this form.
>
> Ms. Ballard: It's just an official – so we can say and document – that we told that at any point in time, you don't have to answer anything that we want to ask you about. So if you can just take a look at this.

Int. Tr. 25:10 – 26:7.

Even more, while Mr. Inofuentes was reading the *Miranda* waiver and noting that he should have "read it a bit more carefully," Int. Tr. 27:16-17, Agent Ballard falsely represented that the *Miranda* waiver was "for [his] own protection." Int. Tr. 27:22. TFO Bartos then encouraged Mr. Inofuentes to sign the waiver – "Let's do this," Int. Tr. at 27:21 – and underscored the

5

misleading narrative that agents provided the *Miranda* waiver to Mr. Inofuentes because they "[j]ust want to make sure [he is] protected." Int. Tr. 28:7-8.

Immediately following Mr. Inofuentes' purported waiver of his *Miranda* rights – based on the agents' affirmative misrepresentations that those rights applied to only off-the-cuff, unintentional comments about drug smuggling, and that waiving his rights was for his "protection" – the agents returned to the false premise under which Mr. Inofuentes agreed to speak with them:

TFO Bartos:  Let me sign this since – all right.  So do you smuggle drugs?

Mr. Inofuentes:  No, I don't.

Int. Tr. 28:20-22.

Agents then asked Mr. Inofuentes numerous questions about drug smuggling. Int. Tr. 29:2 – 32:22.

The deceptive statements from agents rendered invalid the *Miranda* waiver of Mr. Inofuentes. These statements contradicted Mr. Inofuentes' actual *Miranda* rights by confusing the scope of his rights and the consequences of waiving the same. As such, his waiver was based on affirmative deceit and was involuntary.

First, agents may not deceive a defendant about "the nature of the right being abandoned," *Moran v. Burbine*, 475 U.S. 412, 421 (1986), especially where doing so contradicts a defendant's actual *Miranda* rights. *See, e.g.*, *California v. Prysock*, 453 U.S. 355, 360 (1981) (highlighting the impermissibility of *Miranda* warnings that "did not fully advise the suspect" of his rights and discussing as problematic warnings that "suggested any limitation" on those rights). The Eleventh Circuit's decision in *Hart v. AG*, 323 F.3d 884, 894-95 (11th Cir. 2003), which has been cited with approval in the Fourth Circuit,[1] is instructive. The *Hart* court found that the officer's statements

---

[1] *United States v. Santiful*, 701 Fed. App'x 242, 244 n.1 (4th Cir. 2017).

about how "honesty wouldn't hurt him" contradicted the *Miranda* warning that anything the defendant said could be used against him in court. *Id.* at 894. Given this contradiction about the legal scope of the defendant's rights, the Eleventh Circuit found that the decision to waive his rights was not voluntary, knowing, and intelligent. *Id.* at 895. The waiver was instead "the product of [the officer's] deception and, as a result of her contradictory statements, he did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it." *Id.*

Similarly, agents may not contradict the scope of a defendant's *Miranda* rights in a way that "blurred" the exact rights that a defendant was waiving. In *United States v. Clark*, 687 F. Supp. 3d 721, 755 (E.D. Va. 2023), the officer, after faced with a question from the defendant about the nature of his rights, "mischaracterized exactly what rights [the defendant] was waiving by stating that [the defendant] was 'not waiving any other rights except to have counsel here present at this time." *Id.* This statement, even when coupled with a warning that the defendant need not talk at all, "sufficiently blurred the upshot of [the defendant's] decision so as to render [his] waiver unknowing." *Id.*

Mr. Inofuentes did not knowingly surrender his *Miranda* rights because Agent Ballard intentionally blurred and obfuscated the scope of Mr. Inofuentes' rights in a manner that contradicted his actual rights. Agent Ballard deceptively narrowed the applicability of Mr. Inofuentes' *Miranda* rights to one narrow line of inquiry: drug smuggling. Int. Tr. 25:10 – 26:7. In doing so, Agent Ballard intentionally confused the issue and anchored Mr. Inofuentes' understanding of his constitutional rights to one "line of questioning" that undeniably was not the subject of his custodial interrogation and for which the exercise of his constitutional rights would not play a role. *Clark*, 687, F. Supp. 3d at 755.

7

Doing so was classic misdirection about a material issue: the constitutional protections afforded to Mr. Inofuentes. As Agent Ballard described it, Mr. Inofuentes' protection against self-incrimination was only at risk on the off chance that Mr. Inofuentes by accident "vomited" out incriminating information about drug smuggling. Int. Tr. 25:10-22. With respect to "this part" of the interrogation, about drug smuggling, Mr. Inofuentes was advised that he could stop the questions or decline to answer the questions. *Id.* Put simply, Agent Ballard deceptively downplayed the circumstances in which Mr. Inofuentes' protection against self-incrimination would apply and confused the rights otherwise afforded to Mr. Inofuentes.

But Mr. Inofuentes' *Miranda* rights were not limited. His protections attached to his statements about all topics, not just questions proffered under the false premise of investigating drug smuggling. By deceiving Mr. Inofuentes about when his right to self-incrimination was at play, Agent Ballard deceived Mr. Inofuentes about the nature of the right he was surrendering and deceptively narrowed the circumstances in which it would apply. In this way, she "blurred" the true extent of his rights and contradicted his actual rights. *See, e.g.*, *Moran*, 475 U.S. at 427 (instructing how "full comprehension" of the rights abandoned are required to find a voluntary waiver). Mr. Inofuentes' *Miranda* waiver was therefore unknowing. *See also United States v. Murphy*, 703 F.3d 182, 193 (2d Cir. 2012) (affirming the district court's suppression of a custodial statement where the agent "confused" the defendant's rights such that the defendant did not understand the rights he was waiving).

Second, and more perniciously, agents misled Mr. Inofuentes about the consequences of waiving his rights by falsely indicating that doing so was for Mr. Inofuentes' "own protection." In doing so, agents misled the defendant "concerning the consequence of relinquishing his right to remain silent." *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (holding that the trial

court erred in admitting the defendant's statement in light of agents' misleading contradiction that signing a *Miranda* waiver "would not hurt him"); *see also Gilliam v. Sealy*, 932 F.3d 216, 236 (4th Cir. 2019) (finding an involuntary waiver where the officers "induced their confessions using a number of threats and promises[, including] that Appellees could go home if they signed the *Miranda* waivers and written confessions," among other improper promises); *accord Hart*, 323 F.3d at 894-95 (striking down a confession based on instructions that downplayed the detrimental consequences of speaking with agents: that statements could help the defendant, not hurt him).

Here, the Agents turned Mr. Inofuentes' Fifth Amendment rights on their head. Mr. Inofuentes' *Miranda* rights, including his right to remain silent and not incriminate himself, were for his protection. Mr. Inofuentes could protect himself by remaining silent and not incriminating himself with his own statements. Waiving those rights is undeniably not for this protection.

Agents nonetheless simultaneously encouraged Mr. Inofuentes to relinquish his rights – "Let's do this," Int. Tr. 27:21 – while misleading him that doing so was for his "protection." Int. Tr. 27:22–- 28:7-8. Such "intentional[] false representations" are "never appropriate" and render any resulting statements involuntary. *See, e.g.*, *United States v. Harris*, 72 F. Supp.3d 1332, 1337 (N.D. Ga. 2014). Indeed, in misrepresenting to Mr. Inofuentes that speaking with agents was "for his protection," the agents "directly contradicted the very right that the *Miranda* warnings seek to safeguard." *United States v. Ramirez*, 991 F. Supp. 2d 1258, 1270 (S.D. Fl. 2014) (finding as involuntary a statement made after an officer told the defendant that "it would be worse" if defendant did not speak with agents, which contradicted the defendant's rights).

The circumstances at the time of Mr. Inofuentes' purported waiver also cut in favor involuntariness. *Giddins*, 858 F.3d at 855. At the time, Mr. Inofuentes had been escorted by agents to a controlled-access room. The door was closed, and he was not free to leave. Mr. Inofuentes

9

had already missed his connecting flight because of his purported secondary inspection and expressed concern about his ability to continue to his travels. Int. Tr. at 26:16-22. Mr. Inofuentes also stated that he hoped to be on the next flight, to which TFO Vargas told him, "Don't worry." Int. Tr. at 26:20. This deceptive statement again sought to take advantage of Mr. Inofuentes' expressed concern about the interview and downplay the consequences of him speaking with agents. *Giddins*, 858 F.3d at 855 (highlighting "grave concern" about how the custodial interview took place under "false pretenses"). Indeed, Mr. Inofuentes would have indeed missed all connecting flights if agents had received the authorization to charge him with a felony and detain him, as planned. Ex. 3 at 2 (noting how agents did not receive authorization to charge him from an AUSA in SDFL). Such facts, if disclosed, indeed would have caused Mr. Inofuentes to "worry." Int. Tr. at 26:20.

Based on the foregoing, Mr. Inofuentes' decision to relinquish his *Miranda* rights was neither knowing nor voluntary but instead the product of deception and coercion. This deception infected both his understanding of his rights and the consequences of abandoning those rights. Suppression is therefore warranted.

      ii. **Post *Miranda* waiver, agents continued to unconstitutionally extract statements from Mr. Inofuentes through deception and coercion**

After fraudulently inducing Mr. Inofuentes' *Miranda* waiver, agents continued to instruct Mr. Inofuentes in a way that contradicted his *Miranda* rights, misrepresented the consequences of answering their questions, and implicitly promised him leniency in exchange for answering their questions. Such affirmative deception is improper and rendered his statements involuntary. Suppression is again warranted for this additional, independent basis.

Agents repeatedly misrepresented to Mr. Inofuentes the consequences of answering their questions and fraudulently induced him to answer their questions with implicit promises of

10

leniency. They did so at the most critical juncture of the interview: questions about his interactions with Individual-1. These deceptive and coercive comments by agents included, among other statements:

- When Mr. Inofuentes expressed concern about answering questions, Agent Ballard falsely instructed him, "I mean, just being honest, honestly, is just, like, the most important part **so we can just check this box and say we talked about it**." Int. Tr. 92:15-18.
- Instructing Mr. Inofuentes to be honest with them because "it's actually illegal to lie to us" and "I don't want you to put your foot in your mouth" "**or get yourself in trouble for no reason**." Int. Tr. 94:1-16 (indicating in light of the "check[ing] the box" statement that the only way Mr. Inofuentes would be in "trouble" was if he lied).
- Coercing Mr. Inofuentes to answer their questions because "We're all adults, **just say it. Just say what it is.**" Int. Tr. 94:18-21.
- Pressuring Mr. Inofuentes to answer their questions because "--we just want you to be honest, that's it. **You have to be truthful**. **And then, this is honestly our last checkbox and then we can wrap up this interview**." Int. Tr. 95:13-15.
- Instructing Mr. Inofuentes to incriminate himself by telling him, "Please be honest. I'm sorry. I just don't want you to get yourself in trouble. . . . **Just say it**. . . . Please be honest. . . . **You have to say it. Plain English**." Int. Tr. 101:9-14.
- Commanding Mr. Inofuentes to answer their questions under the false promise of leniency, "**Just – I mean, just spit it out so we can wrap up this interview, honestly. I know you have another flight to catch. This is our last check in the box. So that's pretty much it**." Int. Tr. 101:23 – 102:1.
- Again commanding that Mr. Inofuentes incriminate himself under another false promise of leniency, "**Just get to the point, we get this over with, and we get out of here**." Int. Tr. 103:21-22.
- In response to Mr. Inofuentes' question, "We're in trouble now, right[,]" Agent Ballard affirmatively misleads him with the response, "**No**. . . ." Int. Tr. 106:19-20.

Each of the above statements constitutes unconstitutional coercion and an independent basis to suppress Mr. Inofuentes' custodial interview. Taken together, suppression must be the proper remedy.

11

First, Agent Ballard falsely represented to Mr. Inofuentes that he would only get in trouble if he was not honest. Int. Tr. at Int. Tr. 94:1-16 (falsely highlighting that the only way that Mr. Inofuentes would get in "himself in trouble" was by not being truthful); Int. Tr. 101:9-14 (falsely imploring Mr. Inofuentes to "just say it" so that he does not get "in trouble"). These representations were false. Agent Ballard was affirmatively encouraging Mr. Inofuentes to incriminate himself with his own statements so that she could charge him with a felony and detain him. Ex. 2. This deceit undermined and contradicted the *Miranda* warning that anything that Mr. Inofuentes said would be used against him. Suppression is therefore warranted. *See supra*.

Second, Agent Ballard falsely instructed Mr. Inofuentes that he had to answer their questions in direct contravention of Mr. Inofuentes' *Miranda* rights. Agent Ballard falsely instructed Mr. Inofuentes to "just say it . . . [y]ou have to say it. Plain English. . . . spit it out . . . just get to the point . . . ." Int. Tr. 101:23 – 102:1. Agent Bartos also falsely told Mr. Inofuentes that, "You have to be truthful[,]" which was an instruction that Mr. Inofuentes had to answer their questions. Int. Tr. 95:13-15. These deceptive and coercive instructions contradicted Mr. Inofuentes' fundamental right to remain silent. Suppression is again warranted. *See supra*.

Third, Agent Ballard repeatedly offered Mr. Inofuentes an implicit promise of leniency if he answered the agents' questions and incriminated himself as to Individual-1. Agent Ballard implicitly promised Mr. Inofuentes that the only way he would "get . . . in trouble" was if he did not answer their questions honestly and truthfully. Int. Tr. 94:1-16; Int. Tr. 95:13-15; Int. Tr. 94:1-16; Int. Tr. 101:9-14. These affirmative misrepresentations were made around the time that Mr. Inofuentes expressed obvious nervousness and discomfort towards the line of questioning, Int. Tr. 94:8-9, and questioned whether he would in fact get in trouble.

Indeed, Agent Ballard falsely represented to Mr. Inofuentes that as soon as he answered the agents' questions about Individual-1 (in a way that Agent Ballard believed would incriminate himself), he would be free to go because the "box checking" exercise would be over, they would "wrap it up," and "get out of here." Int. Tr. 101:23 – 102:1; Int. Tr. 103:21-22. The opposite was true. Agent Ballard went into the interview anticipating "potential detention" of Mr. Inofuentes. Ex. 2.

Such promises were both deceptive and coercive, and fraudulently induced Mr. Inofuentes to continue speaking to agents. The deceptive statements were made to coerce Mr. Inofuentes into incriminating himself under the guise that he would be free to go as soon as he did. Certain statements were also made in response to Mr. Inofuentes' inquiring about whether his remarks would, in fact, get him in trouble. Int. Tr. 92:15-18 ("So this is not good for me. [Agent Ballard:] I mean, **just being honest, honestly, is just, like, the most important part so we can just check this box and say we talked about it**."); Int. Tr. 106:19-20 ("We're in trouble now, right[?]" [Agent Ballard:] "**No**. . . .").

The Fourth Circuit has previously expressed "grave concerns" about similar agent conduct in finding unconstitutional coercion under similar circumstances. In *United States v. Giddins*, the Fourth Circuit analyzed the propriety of an officer's deception in response to the defendant's questions of whether he was "in trouble." 858 F.3d. at 883-84. The officer responded that he was not, even though the officers were planning to arrest him. *Id.* Such a false statement "affirmatively misled" the defendant and "constitute[d] coercion." *Id.* at 884. Because such statements "encouraged" the defendant to waive his rights, the officer's deception "was sufficient to rise to the level such that [the defendant's] will was overborne or his capacity for self-determination critically impaired." *Id.* at 885.

Other decisions are in accord. *See also United States v. Santiful*, 701 Fed. App'x 242, 244 n.1 (4th Cir. 2017) (citing *Hart*, 323 F.3d at 894 (suppressing statements after an agent improperly told the defendant that "honesty will not hurt you" because such a statement "is simply not compatible" with the phrase that "anything you say can be used against you in court")); *cf. United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) (affirming the denial of a suppression motion because "the agents made no specific promises of leniency in exchange for [the defendant's] statement"); *see also United States v. Shears*, 762 F.2d 397, 402 (4th Cir. 1985) ("[T]here are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception of what government agents have promised is an important factor in determining voluntariness"); *see also Beale*, 921 F.3d at 1435; *Harris*, 72 F. Supp. 3d at 1337 (suppressing statements after the agent misled the defendant into believing his statements would not incriminate him).

Even more, the "totality of the circumstances" support the coercive impact of these deceptive statements. *Giddins*, 858 F.3d at 883-85. Agents encouraged Mr. Inofuentes to speak with them under the "false pretenses," *id.* at 885, that his interview was a mundane, compulsory "box checking" exercise. Int. Tr. 92:15-18. Mr. Inofuentes was also questioned in a controlled-access room and had expressed a desire to continue his travels and end the interview as quickly as possible. Tr. Int. at 26:16-27 (lamenting how he "missed the flight already" and how he's "hoping to be on the three o'clock flight"); Tr. Int. at 56:19-57:2 (discussing how Mr. Inofuentes had already missed his connection, hoped to make the next flight, and that the agents would "be done probably in the next ten minutes or so"); Tr. Int. at 101:24-25 ("just – I mean, just spit it out so we can wrap this interview up, honestly. I know you have another flight to catch"). Mr. Inofuentes repeatedly expressed a desire to end the interview so that he may continue his travels, which the agents

14

repeatedly answered with more misdirection. Int. Tr. 56:20 – 57:2 (MI: " . . . . I'm going to – I'm going to shoot for three o'clock [connecting flight], so I'm going to be out of here probably, like, in a half an hour or an hour maximum."; AB: "Oh, **we'll be done probably in the next ten minutes or so**."). Additionally, throughout the interview, Mr. Inofuentes was physically and emotionally exhausted because he didn't "sleep very well," Int. Tr. 49:17-19, the night before boarding his flight because he thought someone was trying to rob him. Int. Tr. 64:23 - 70:16 (explaining why he "didn't sleep" the night before). These circumstances, coupled with the agents' badgering of him about private and intimate details of his life, made him exceedingly uncomfortable. Int. Tr. at 93:16-17 (noting how the agents' questions were "super uncomfortable"); Int. Tr. 94:8-9 ("I see you getting nervous").

Even more, Mr. Inofuentes – who has no meaningful experience with the criminal justice system – was also lured into speaking with agents under false promises of leniency, so long as he was honest. Indeed, Agent Ballard contravened in one sentence two of Mr. Inofuentes' *Miranda* rights (the right to remain silent and the warning that his statements could be used against him): "just spit it out so we can wrap up this interview." Int. Tr. 101:23 – 102:1. Mr. Inofuentes expressed in real time the coercive effect of the agents' questioning and lamented about how, in the face of the agents' relentless questioning, he had "to defend [his conduct] until, like, the end. I guess – I don't know about, like, missing flights or being in trouble . . . Honestly, but I'm just trying to give you the information that I have." Int. Tr. at 105:6-12.

Under the circumstances, the agents' deception was designed to "encourag[e]" Mr. Inofuentes to incriminate himself. *Giddins*, 858 F.3d at 885. Given that the agents then used those same statements to charge Mr. Inofuentes, the promises of leniency were not kept, and the statements are involuntary. *See United States v. Lewis*, 466 Fed. App'x 170, 173 (4th Cir. 2012)

15

("Where a defendant reasonably perceives that he has been promised that his charges will be dropped in exchange for his confession, the promise is not kept, and the promise constituted the driving force behind his confession, the confession is involuntary") (citation omitted). The Court should therefore suppress the statements made during the Miami Interview.

      c. **Because the agents' conduct during the Miami Interview violated Mr. Inofuentes' Fifth Amendment rights, suppression is required**

For the above-stated reasons, the agents' conduct during the Miami Interview flagrantly violated Mr. Inofuentes' Fifth Amendment rights. The appropriate remedy is therefore the exclusion of Mr. Inofuentes' statements during the Miami Interview, as well as all evidence obtained directly obtained from his unconstitutional statements: the fruits of the poisonous tree. *See, e.g.*, *United States v. Terry*, 909 F.3d 716, 721 (4th Cir. 2018). Those fruits include the evidence that was obtained as a direct result of the impermissibly obtained statements during the Miami Interview, including the electronic evidence obtained from search warrants that are based on those same statements as well as his interview at Dulles International Airport. *Id.* at 721-23; *see also* Ex. 3 (relying on Mr. Inofuentes' statements from the Miami Interview to detain him again for an additional interview).

Suppression is the appropriate remedy. On the heels of the Miami Interview, agents sought and obtained search warrants for Mr. Inofuentes' electronic devices, email accounts, and iCloud backup. In applying for those warrants, the agent cited directly to incriminating statements that Mr. Inofuentes made during the Miami Interview, such that there is a direct link (both substantively and temporally) between the Miami Interview and the search warrant returns for Mr. Inofuentes' electronic devices and content. *Id.* at 721.

Even more, suppression is warranted in this case because of the need to deter the underlying agent conduct. The agents' misconduct in this case was systematic. It infected both the purported

16

waiver of Mr. Inofuentes' *Miranda* rights and was pervasive throughout the agents' questioning of Mr. Inofuentes about Individual-1. This misconduct was neither isolated nor accidental. It was instead the product of agents' intentional, repeated conduct designed to trap Mr. Inofuentes into incriminating himself. The Court should not countenance such behavior on an issue as critical as a defendant's Fifth Amendment rights.

IV. **CONCLUSION**

The Court should therefore grant this Motion for the above-stated reasons.

Dated: June 20, 2025

Respectfully submitted,

MICHAEL JAIME INOFUENTES
By Counsel

/s/
Nina J. Ginsberg, Esquire
Virginia State Bar No. 19472
Greenspun Shapiro Ginsberg & Yang PC
3955 Chain Bridge Rd., Fl. 2
Fairfax, VA 22030
Phone: (703) 352-0100
Fax: (703) 591-7268
Email: njg@greenspunlaw.com

Scott Armstrong, Esquire
McGovern Weems, PLLC
1050 15th Street, Suite 1030, NW
Washington, D.C. 20005
DC Bar No. 993851
(admitted *pro hac vice*)
Telephone: (202) 978-1267
Email: scott@mcgovernweems.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

      I hereby certify that on the 20th day of June, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

/s/
Nina J. Ginsberg