IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-CR-5 (PTG) |
| MICHAEL JAIME INOFUENTES, | |
| *Defendant*. | |

## UNITED STATES' RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS [DKT. 92]

The United States of America hereby opposes the Motion to Suppress His Custodial

Statements (Dkt. 92) filed by defendant Michael Jaime Inofuentes.  The defendant was not in

custody when he was interviewed by law enforcement at Miami International Airport, and

therefore *Miranda* warnings were not required.  But even if he was, the agents provided *Miranda*

warnings to the defendant, which he knowingly and voluntarily waived.  The defendant's

subsequent admissions to law enforcement were made knowingly and voluntarily and were the

product of his free will.  Thus, no Fifth Amendment violation occurred, and the defendant's

motion should be denied.

## FACTUAL BACKGROUND[1]

On November 1, 2024, the defendant arrived at Miami International Airport (MIA) on a

flight from Medellin, Colombia.  Upon arrival, the defendant went to U.S. Customs, where he

---

[1] The factual background of the investigation is set forth in detail in the United States' Response
in Opposition to the defendant's Motion to Suppress the border search, which the United States
hereby incorporates by reference.  Dkt. 70 (Gov't Resp. Br.).  The United States provides this
additional information, as relevant to the defendant's instant Motion to Suppress his statements.

1

waited in the primary inspection line.  At approximately 11:23 AM, the defendant reached the customs desk and provided his passport to the Customs and Border Protection (CBP) officer, who scanned it and took the defendant's photo.  Upon scanning his passport, the CBP officer was alerted that the defendant had been selected for a secondary inspection.  The defendant was then escorted by another CBP officer to the secondary inspection area.

The secondary inspection area is located in MIA and includes a lobby and adjoining corridor with interview rooms.  At secondary inspection, the defendant's passport was given to CBP Officer Fernanda de Oliveira.  Officer Oliveira then walked with the defendant down the hallway to an interview room, where she conducted a brief admissibility interview of the defendant.  The admissibility interview consisted of several questions regarding the nature of his travel, including where he was coming from, where he was going, the purpose of his trip, and what he was bringing into the country.  Officer Oliveira also detained the defendant's electronic devices, which she provided to Homeland Security Investigations (HSI) Special Agent (SA) Miranda Ballard for her to perform a manual inspection pursuant to border search authority.

While SA Ballard conducted her manual inspection of the defendant's iPhone, the defendant waited in the interview room.  The defendant was not handcuffed or physically restrained in any way, and he had freedom of movement around the secondary inspection area, including the bathrooms and vending machine.  After conducting her manual inspection of the defendant's iPhone, SA Ballard and CBP Task Force Officer (TFO) Stephan Vargas interviewed the defendant.[2]  The interview was audio recorded and lasted approximately 3 hours.  *See* Exhibit

---

[2] The transcript of the interview attached to the defendant's Motion as Exhibit 1 erroneously lists TFO Vargas as "Mr. Bartos."

1 (audio-recorded interview).  For the interview, SA Ballard and TFO Vargas were in plain clothes and did not have visible weapons.

In the beginning of the interview, SA Ballard and TFO Vargas introduced themselves and told the defendant that because he had a lot of international travel, and not many inspections, they were going to "go through their routine" with the defendant.  The agents obtained the defendant's background information, including his name, the languages he spoke, where he was from, and his family situation.  As the agents obtained this information, they engaged in small talk about sports, music, and the defendant's education.

At approximately 16 minutes, the agents transitioned to asking the defendant about his activities in Colombia.  SA Ballard told the defendant, "So the other part of this that we like to do, based on, like we said, your travel, it seems that you have a lot of travel to Colombia, and so we have specific problem sets that we like to talk about related to your travel to Colombia."  Dkt. 93-1 at 7.  She said, "So for part two, what we want to ask you about is specific problem sets in Colombia, which of course, like we said, there was a big drug cartel problem. Not as big a problem anymore. But does still exist, and we do still encounter that here at the airport, drug loads coming in. So we want to talk to you about those types of topics."  *Id*. at 7-8.  SA Ballard went on to say, "And we want to ask you questions about what you may know, what you may have seen, if you know of anybody involved in that, in order for us to ask you those more specific questions, right? There's a possibility that you might come out and like word vomit, 'I moved drugs,' right? So because of that, for that reason, before we start that line of questioning, we want to make sure that you understand that at any point in time of this part, you can stop. You can say, I don't want to answer that question, or I don't want to answer any questions."  *Id*. at 8. The defendant responded, "I understand" and then the agents provided him with the Statement of

3

Rights form (Exhibit 2).  After providing the form, SA Ballard told the defendant it was an official document that says they told him that "at any point in time, you don't have to answer anything that we want to ask you about. So if you can just take a look at this."  Dkt. 93-1 at 8. The defendant then asked for the time and remarked that he had missed his flight already.[3]  *Id.* Immediately after he said, "Okay. Let's go for it" and he was "hoping to be on the three o'clock flight."  *Id.*

TFO Vargas confirmed multiple times that the defendant had read and understood his rights.  After he was given the Statement of Rights Form, the defendant paused for 15 seconds to read it, and then began to sign the waiver portion.  Concerned that he had read it too quickly, Vargas asked the defendant, "You've read them all?"  *See* Exhibit 1 at 18 minutes 26 seconds. Then, "No, I'm asking, did you read them all? Do you see what I'm saying?"  *Id.*  The defendant replied that he "should have read it a little bit more carefully."  *Id.*  SA Ballard said, "Yeah, we just want to make sure you understand everything."  *Id.*  And Vargas told the defendant, "Let's do this. Read each one, and then put your initials at the end of it, so that we – that – as long as you understand it, put your initials."[4]  *Id.*  The defendant said, "Okay. Got it."  And Vargas told him, "if you don't, ask us and we'll explain it a little bit more."  *Id.*  "Just want to make sure you're protected."  *Id.*  At that point, the defendant initialed next to each of his *Miranda* rights and executed the waiver portion of the form, indicating he understood his rights and was willing to answer questions without a lawyer present.  After TFO Vargas signed the form, he asked "do you smuggle drugs?"  *Id.*  The defendant said he did not.  *Id.*  Then, TFO Vargas asked, "First of

---

[3] The defendant was originally booked on a 1:18pm connecting flight departing Miami for DC.

[4] The recording (Exhibit 1) makes clear that TFO Vargas did not say "Let's do this" to suggest the defendant sign the waiver portion of the form, as the defendant claims, but rather to focus him on reading each right and initialing next to the rights as long as he understood them.

all – first of all, do you want to talk to us?" *Id*. The defendant replied, "I'm willing to [] discuss anything." *Id*. at 8-9.

The agents proceeded to question the defendant about drug activity in Colombia, then transitioned into a discussion about how the defendant had spent his time during his latest trip to Colombia. *Id*. at 9. They paused questioning the defendant about his trip to talk with him about how he could potentially bring his children in Colombia to the United States. *Id*. at 10. TFO Vargas told the defendant that because his children were the children of a United States citizen, they would "get the first privilege of getting their residencies." *Id*. TFO Vargas encouraged the defendant to look into it, telling him "if you want to get your kids here, you know, set up where they're a little bit closer to you, you know?" *Id*. at 10-11. The agents then resumed asking questions about the defendant's most recent trip.

At approximately 44 minutes into the interview, the agents asked the defendant if he has commercial sex when he goes to Colombia. *Id*. at 17. The defendant said, "no" he did not have commercial sex in Colombia. *Id*. The defendant then told the agents a lengthy story about how he had been followed on his motorcycle by a group of men during his last trip. *Id*. The agents then turned back to questions about commercial sex in Colombia. They asked the defendant if he was familiar with the posters in Medellin saying, "Don't even think about it" and the issue of foreigners traveling to Colombia to have sex with minors. *Id*. at 19. The defendant indicated he was familiar ("Mm-hmm"). *Id*. SA Ballard asked the defendant if he has sex with minors when he travels to Colombia. *Id*. at 20. The defendant replied, "No." *Id*. The defendant agreed that there were certain "tourist parts" that were popular for illicit activity, including "San Diego." *Id*. at 20-21. The defendant continued to deny that he had ever engaged in commercial sex with a minor. *Id*.

At approximately 1 hour into the interview, SA Ballard asked the defendant about the contact entry for Minor 1 in his phone. *Id*. at 23. SA Ballard asked, "Who is that?" *Id*. The defendant replied, "I believe -- in -- and I wrote 2024 because I'm looking for, like, something to identify them." *Id*. Then he said, "That would be the mother of the children. So I can get rid of -- that would be [name redacted]." *Id*. TFO Vargas asked, "The mother of the – " and the defendant said, "The baby mama, as you've -- as you've heard. And -- the -- the -- the mother[.]" TFO Vargas asked again, "The mother of which children?" and the defendant replied, "My two children[.]" *Id*. SA Ballard showed the defendant a photo of Minor 1 on his phone and asked him, "who's this?" *Id*. The defendant gave Minor 1's first and last name, but then lied and said she was not the same person as the contact entry. *Id*. SA Ballard asked the defendant if he knew how old she was. *Id*. The defendant said, "She is, I believe, 17, but I have nothing romantic with this girl." *Id*.

For the duration of the interview, the defendant gave numerous conflicting statements about the nature of his relationship with Minor 1. The defendant said his relationship with Minor 1 was "friendly" "a flirtatious thing" but "not [] like, a person who I would – I associate with[.]" *Id*. SA Ballard told the defendant the agents were reading the messages, and Vargas asked if there was "sexual talk, you know, something like that going on?" *Id*. The defendant said, "No, never been – no, not like that, no." *Id*. He told the agents he had only seen Minor 1 "like, once or twice[.]" *Id*. at 23-24. The defendant repeated that he had not had sex with Minor 1, but he probably has "sexual photos." *Id*. at 24. The agents told him that they can "see it" and "read it" and they "just want [him] to be honest, that's it." *Id*. at 24-25. TFO Vargas stated, "You have to be truthful." *Id*. at 25. And SA Ballard said, "And then, this is honestly our last checkbox and then we can wrap up this interview, so." *Id*. The defendant said he had been "romantically

6

involved" with Minor 1, but he is not "having sex with her." *Id*. He immediately followed that by saying the relationship was "physical" and "sexual." *Id*. The defendant repeated several more times that he had not had sex with Minor 1. Then, he said their relationship involved "hugging" and "kissing" but not "sexual touching, like sex, sex, sex. No." *Id*. at 26. The agents pointed out that the defendant had just told them he had sexual relations with Minor 1, but now he was telling them he had not. *Id*. The defendant gave a meandering non-response to this, and SA Ballard cut in to remind him to "Please be honest." *Id*. at 27. Vargas said, "You just have to say it. Plain English." *Id*. Once again, the defendant began to make a non-responsive statement ("I can tell you that, like, I had the mariachis and – and then, like, I had, like, a – this is at my house, so – "), and SA Ballard told him, "I mean, just spit it out so we can wrap this interview up, honestly. I know you have another flight to catch. This is our last check in the box. So that's pretty much it." *Id*. The defendant responded, "Spooning. She slept in the bed with me. And it's sexual." *Id*. Then he said, "but it's not sexual, like sex. And I'm not naked. And she's not naked. Well, anyway, I know that she was sleeping in the bed. Honestly. This is so bad." *Id*. SA Ballard told the defendant, "Please tell the truth," and he said, "I'm going to go to jail now. This is horrible." *Id*. TFO Vargas then asked him if he penetrated Minor 1's vagina with his penis, and the defendant said, "Honestly not." The defendant said that Minor 1 said she is pregnant and she says he is the father of her baby. *Id*. at 28. SA Ballard told the defendant, "there's only one way that's possible" and the defendant said, "through sex." *Id*. TFO Vargas said, "You have to penetrate the vagina to have a baby. So you might as well – did you have sex with her? The answer is yes." *Id*. The defendant said, "The answer is yes, but I'm not trying to lie here." *Id*.

At approximately 1 hour and 30 minutes, the defendant asked the agents, "If I have to get a lawyer and come back here to Miami or something like that?" SA Ballard asked, "Hmm?

7

What?"  The defendant said, "I want to know if you're pressing charges on me, or -- I'm just getting ahead of myself."  SA Ballard then asked him, "is there anything else that we haven't covered, or you can think about that we've asked that you didn't think of before that you want to add, or anything like that?"  The defendant said, "honestly, no. I would love to offer more information, and if you guys need to get me back here, I'll be back here. Or if I'm not allowed to go, I understand. But the thing is, no, at the moment, I'm, I'm not . . ."  TFO Vargas then began asking the defendant about another girl in his phone.

At approximately 1 hour and 20 minutes, the agents asked the defendant about the conversation he had with Minor 1 about meeting in San Diego at a hotel and negotiating a price ("she's going to go down to San Diego and you're saying that you would give her this much money or does she want somebody else from San Diego, or -- so that's why -- that's how it reads.").  The defendant said, "I have to concur with what I've written, or else I don't.  So I guess I could say I – I plead the Fifth, but the thing is – the thing is, that honestly, I'm not – I'm not exploiting this person, okay? And I'm not going to Colombia for sex. It really appears that that's what I'm doing. But I'm not doing that. I'm not doing it."

At approximately 1 hour and 42 minutes, SA Ballard told the defendant "I want to get – be done with this."  The defendant said, "Because I'm just flying home."  The agents asked additional questions about sex trafficking in Colombia, and then SA Ballard tried to wrap up the interview.  She asked, "anything else?" and the defendant replied, "No. I mean, I will be – I'm available if you want to be in touch with me. And I'd be happy to help. Honestly, I know you're up to good. I know you guys are doing good things and – and trying to do good things."  The agents stepped out of the room and the defendant remained there by himself unrestrained.  This part of the interview lasted approximately 2 hours.

Sometime later, SA Ballard, TFO Vargas, and Officer Oliveira, returned to the interview room. SA Ballard told the defendant they just had a couple follow-up questions related to what they were talking about before. They asked the defendant questions about where and when he met Minor 1 and how many times they had been together. SA Ballard asked the defendant about his messages with Minor 1 where they discussed that Minor 1 was having sex for money and that she was having sex with the defendant. SA Ballard told the defendant there were incongruencies between his messages and what he was telling the agents about his relationship with Minor 1. This follow-up interview lasted approximately 51 minutes. The agents stepped out again and the defendant remained. They returned a few minutes later to ask the defendant questions about a message to Minor 1. Specifically, they wanted to know why the defendant had sent Minor 1 the cedula number for Subject-1. The defendant said he must have made a "stupid mistake." This lasted approximately 9 minutes.

At the conclusion of the interview, the defendant left the interview room, retrieved his passport, and was admitted to the U.S. The defendant left MIA and returned to his home in Virginia. On November 4, 2024, the defendant was arrested at Washington Dulles International Airport, in the Eastern District of Virginia.

## PROCEDURAL HISTORY

On November 5, 2024, the defendant was charged via criminal complaint with engaging in illicit sexual conduct in a foreign place. Dkt 1. On January 8, 2025, the grand jury returned a single-count Indictment charging the defendant with engaging in, and attempting to engage in, illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c), (f), and (g)(2). Dkt. 25. On April 22, 2025, the grand jury returned a Superseding Indictment, which added a charge of sex trafficking of a child, in violation of 18 U.S.C. §§ 1591, 1594, and 1596. Dkt. 64. A jury

trial is currently set to begin on September 9, 2025.  On June 20, 2025, the defendant filed a

Motion to Suppress his statements made during his interview in Miami.  Dkt. 92.

## ARGUMENT

The Fifth Amendment commands that "[n]o person ... shall be compelled in any criminal

case to be a witness against himself."  U.S. Const. amend. V.  This privilege against self-

incrimination attaches whenever a person is in custody and subject to interrogation.  *United*

*States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007) (citing *Miranda v. Arizona,* 384 U.S. 436,

467 (1966)).[5]  To determine whether a person is in custody for purposes of *Miranda*, "[t]wo

discrete inquiries are essential to the determination: first, what were the circumstances

surrounding the interrogation; and second, given those circumstances, would a reasonable person

have felt he or she was at liberty to terminate the interrogation and leave."  *J.D.B. v. North*

*Carolina*, 564 U.S. 261, 270 (2011) (quoting *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)).

Then, "the court must apply an objective test to resolve the ultimate inquiry: was there a formal

arrest or restraint on freedom of movement of the degree associated with formal arrest."  *Id*.  A

suspect not subject to custodial interrogation is not entitled to *Miranda* warnings.  *United States*

*v. Doan*, 184 F. Supp. 3d 271, 278 (E.D. Va. 2016) ("*Miranda* applies only "where there has

been such a restriction to a person's freedom as to render him 'in custody.' ").

In general, routine questioning of individuals at the border by customs officers for the

purpose of determining admissibility or applying customs laws will not require *Miranda*

warnings, even though there is the potential to elicit incriminating statements, because such

---

[5] *See also id.* at 478-79 (an individual in police custody and subject to interrogation must be
advised of his right to remain silent, that anything he says can be used against him, that he has a
right to an attorney, and that an attorney will be provided to him at no cost if he cannot afford
one.).

interviews are routine and therefore non-custodial.  *United States v. Leung*, No. 86-5131, 1987 WL 37643 at *1 (4th Cir. May 4, 1987) (unpublished) (citing *Carroll v. United States*, 267 U.S. 132, 154 (1925)).  The Supreme Court in *Carroll* noted that at the border, a person must establish that he and his effects are entitled to enter.  In *United States v. Ramsey*, 431 U.S. 606, 619 (1977), the Court noted that constitutional rights analysis is distinctly different at the border due to the heightened interest of the sovereign. While the Supreme Court has not addressed the application of *Miranda* to the border context, several federal circuits considered the issue and held that, in general, routine questioning of persons at the border by customs officers does not trigger a need for *Miranda* warnings.  *See e.g.*, *United States v. Galloway*, 316 F.3d 624, 630 (6th Cir. 2003); *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996); *Chavez-Martinez v. United States*, 407 F.2d 535, 539 (9th Cir. 1969) (noting that individuals entering the country are routinely asked about citizenship, origin or destination of travel, and any merchandise they may be bringing with them).  "Referral to secondary inspection at a border checkpoint does not constitute an arrest requiring Miranda warnings."  *United States v. Hernandez*, 229 F. App'x 331, 332 (5th Cir. 2007) (unpublished).  However, where the circumstances of questioning at the border approximate those of a formal arrest, warnings are required.  *See United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007); *see also Galloway*, 316 F.3d at 630; *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011); *United States v. Chavira*, 614 F.3d 127, 134 (5th Cir. 2010).

A defendant may waive his *Miranda* rights so long as the waiver is knowing, intelligent, and voluntary. *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). The determination of whether the waiver is valid has two parts: "[f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than

intimidation, coercion, or deception," and "[s]econd, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Cristobal*, 293 F.3d 134, 139–40 (4th Cir. 2002) (internal quotation marks and citations omitted). Voluntariness hinges on " 'whether the defendant's will has been overborne or his capacity for self-determination critically impaired,' because of coercive police conduct." *Id.* at 140 (quoting *United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir.1987)).

The defendant was not in custody when he was interviewed by law enforcement in Miami.  But even assuming for argument that he was, he was properly advised of his *Miranda* rights and made a knowing, intelligent, and voluntary waiver of his rights.  His subsequent statements and admissions were made voluntarily, of his own free will, and were not the product of any police coercion (a requirement to establish involuntariness).  Therefore, the defendant's motion should be denied and his statements should not be suppressed.

## I.    The defendant was not in custody when he was interviewed in Miami.[6]

As stated above, "*Miranda* warnings are required for the *in-custody interrogation* of persons suspected or accused of crime." *United States v. Leggette*, 57 F.4th 406, 410 (4th Cir.

---

[6] In three sentences, the defendant dismisses the argument that he was not in custody when he was interviewed at MIA.  *See* Dkt. 93 at 2 ("there cannot be any reasonable dispute that Mr. Inofuentes was 'in custody' for purposes of *Miranda*'s safeguards.").  However, the cases he cites in support of this assertion do not relate to interviews at the border and are otherwise factually inapposite. *See id.* (citing *United States v. Giddins,* 858 F.3d 870 (4th Cir. 2017) (finding defendant was in custody for purposes of *Miranda* when defendant went to police station to recover his car, which was seized, detectives answered in the affirmative when defendant asked whether filling out *Miranda* waiver and answering the detectives' robbery-related questions was normal procedure for obtaining his car, defendant twice asked detectives whether he was in trouble, detectives responded that he was not in trouble, and at the time, the detectives had an arrest warrant for the defendant and one of the detectives was the affiant for the warrant); *United States v. Woodland*, 285 F. Supp. 3d 864, 869-70 (D. Md. 2018) (interview occurred at post office and involved at least five law enforcement officers, who "continuously

2023) (citing *Miranda*, 384 U.S. at 467 (1966) (emphasis in original)).  "A person is in custody when, under the totality of the circumstances, [his] freedom from action is curtailed to a degree associated with formal arrest, even if he is not formally placed under arrest." *United States v. Pressley*, 990 F.3d 383, 388 (4th Cir. 2021).  The custody analysis "is an objective inquiry" asking whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Hashime*, 734 F.3d 278, 282-83 (4th Cir. 2013); *see also J.D.B.*, 564 U.S. at 270–71; *United States* v. *Parker*, 262 F.3d 415, 419 (4th Cir. 2001) ("Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead [on] the objective circumstances of the interrogation.").  "Relevant factors include the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Pressley*, 990 F.3d at 388.  "Isolation and separation from family members, as well as physical restrictions, also may be relevant and weigh in favor of a finding of custody." *Id*.  "[T]he release of the interviewee at the end of the questioning" is also a relevant factor.  *Howes v. Fields*, 565 U.S. 499, 509 (2012).

In the border context, "in which compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation and [] in which the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the

---

and aggressively talked over Defendant and questioned him in a manner that was, at many points, hostile"); *United States v. Freeman*, 61 F. Supp. 3d 534, 545 (E.D. Va. 2014) (21 law enforcement agents came to defendant's home early in the morning to execute search warrant, and within seconds of waking up, defendant faced several officers wearing tactical bulletproof vests rushing up the stairs with their handguns drawn, one officer used his gun to knock a tissue out of defendant's hand, defendant was under supervision and control of at least one officer at all times, and he was kept separated from his family in a closed bedroom)).

border, a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on." *FNU LNU*, 653 F.3d at 153-154; *United States v. McDowell*, 250 F.3d 1354 (11th Cir. 2001) (finding interrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*; because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States.). "That one expects both constraints and questions—and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave—reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."[7] *Id*. "As a result, the rules surrounding Miranda at the border are more relaxed." *United States v. Molina-Gomez*, 781 F.3d 13, 22 (1st Cir. 2015). Indeed, "many courts have held that persons seeking entry at the border may be questioned without *Miranda* warnings, even though they are also subject to custody until they have satisfied the INS of their right to enter." *United States v. Gupta*, 183 F.3d

_____

[7] Notably, courts, including the Fourth Circuit, have recognized that the "free to leave" standard is not applicable in every custody analysis. *See Jamison*, 509 F.3d at 623 (differentiating between police-imposed restraint and circumstantial restraint and finding defendant was not in custody for purposes of *Miranda* when he was questioned in a hospital emergency room after he sought treatment for a gunshot wound) (citing *Florida v. Bostick,* 501 U.S. 429, 436 (1991) (the defendant's "freedom of movement was restricted by a factor independent of police conduct— i.e., by his being a passenger on a bus"—which rendered the standard "free to leave" analysis inapplicable.)); *see also United States v. Conley*, 779 F.2d 970 (4th Cir.1985) (When, "by definition, the entire population [of inmates] is under restraint of free movement," a person cannot be deemed to be in custody unless a reasonable person would perceive that the police have imposed additional restraints on his freedom of action.). Likewise, individuals subject to a traffic stop are not technically "free to leave" but also are not entitled to *Miranda* warnings in the ordinary course. *See Berkemer v. McCarty,* 468 U.S. 420, 437–42 (1984) (holding *Miranda* warnings are not required when a person is questioned during a routine traffic stop or stop pursuant to *Terry v. Ohio*.).

615, 618 (7th Cir. 1999) (citing *United States v. Ozuna,* 170 F.3d 654, 657–59 (6th Cir.1999);

*Cuban American Bar Association, Inc. v. Christopher,* 43 F.3d 1412, 1427–29 (11th Cir.1995);

*United States v. Layne,* 973 F.2d 1417, 1420 (8th Cir.1992); *United States v. Bengivenga,* 845

F.2d 593, 598–99 (5th Cir.1988)); *see also United States v. Long Tong Kiam*, 432 F.3d 524, 529

(3d Cir. 2006) ("[N]ormal Miranda rules simply cannot apply to this unique situation at the

border. This is a situation utterly unlike a normal law enforcement setting."); *cf. FNU LNU*, 653

F.3d at 148 n. 3 ("The international arrivals section and Customs area of a U.S. airport

undisputedly constitute the 'border' for constitutional purposes.").

 "[E]vents which might be enough to signal 'custody' away from the border will not be

enough to establish 'custody' in the context of entry into [t]he country." *Molina–Gomez*, 781

F.3d at 22 (*quoting Moya*, 74 F.3d at 1120). For example, even though a traveler being

questioned by CBP is not "free to leave," he is not necessarily in custody. *See United States v.

Ventura,* 85 F.3d 708, 711 (1st Cir. 1996) ("[E]ven secondary inspection does not *per se*

constitute custodial interrogation."); *id.* at 712 (explaining that it "is simply wrong" to conclude

that a traveler is in custody because they "may not simply walk away from an interrogating

officer" (internal quotation marks omitted)); *see also United States v. Butler,* 249 F.3d 1094,

1100 (9th Cir.2001) ("[T]he mere detention of a person in a border station's security office from

which he or she is not free to leave, while a search of a vehicle occurs, is not 'custody' for

[*Miranda* ] purposes.").

 In this case, the defendant was not in custody during his interview at MIA.  As stated

above, neither the fact that the defendant was sent to secondary inspection nor that he was

interviewed there, renders the encounter custodial.  *United States v. Fernandez-Ventura*, 132

F.3d 844, 847 (1st Cir. 1998) ("secondary inspection is not innately custodial" and merely

"going directly to secondary inspection" does not make the questioning more coercive; if anything "this likely reduces the total time the traveler has to spend in Customs, which makes the questioning less coercive, not more."); *United States v. Pratt*, 645 F.2d 89, 90 (1st Cir. 1981) (same); *Moya*, 74 F.3d at 1120 (some degree of questioning and of delay is necessary and is to be expected at entry points into the U.S.; therefore, questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest.).  Indeed, some questioning, even lengthy questioning, at a border crossing is an important part of routine entry into a country.  *See FNU LNU*, 653 F.3d at 154-55 (reasonable person would not have believed she was in custody under the circumstances despite ninety minute interview); *Fernandez-Ventura*, 132 F.3d at 848 (one hour and twenty minutes not extraordinary under the circumstances); *United States v. Mora-Santana*, 99 F. App'x 397, 399 n.2 (3d Cir. 2004) (delays of 1 or 2 hours at international borders are to be expected) (citing *United States v. Flores-Montano*, 541 U.S. 149, 155 n.3 (2004)).

Other circumstances surrounding the defendant's interview also support the conclusion that he was not in custody.  The agents did not have visible weapons, and they were dressed in civilian clothes.  Throughout the interview, the agents spoke with the defendant in a cordial tone, never raised their voices, and frequently joked with him and engaged in small talk.  The defendant was never handcuffed or physically restrained in any manner.  Indeed, the defendant clearly understood that he was not under arrest, as he repeatedly referred to future events, like completing the next leg of his flight, and he indicated he would be returning to Colombia the following week.  And, most significantly, the agents told the defendant he did not have to answer their questions.  Before asking the defendant questions about any criminal conduct, SA Ballard told him, "we want to make sure that you understand that at any point in time of this part, you

can stop. You can say, I don't want to answer that question, or I don't want to answer any questions." The defendant stated he understood, and never asked to stop, leave the room, or declined to answer questions.

The defendant may argue that the Court should consider SA Ballard's statement that there could be a "potential detention" (Dkt. 93 at 4, 8; 93-2) in the custody analysis, but that would be incorrect. First, SA Ballard's statement regarding a "potential detention" was in reference to the defendant's electronic devices, which could possibly be detained pursuant to border search authority if they contained contraband or evidence of a crime. Second, even if this statement referred to the defendant himself (which it did not), it would not factor into the analysis, because neither the subjective intent of the agent nor that of the defendant is relevant to the custody determination. *Parker*, 262 F.3d at 419.

The defendant's interview was approximately 3 hours, but in light of the circumstances highlighted above, this factor does not weigh in favor of custody for at least two reasons. First, the agents did not begin asking the defendant questions about commercial sex with minors until nearly 1 hour into the interview, at approximately 51 minutes. Before that, they obtained basic biographical information from the defendant—a discussion peppered with small talk—and discussed the defendant's work and living situation in Colombia. Thus, the amount of time devoted to questions relating to the criminal conduct was actually closer to 2 hours. *See Ozuna*, 170 F.3d at 657 (holding that questioning lasting over an hour does not constitute custody when questions were routine and directed at determining admissibility). Second, the interview was prolonged by the defendant's lengthy and evasive debates about the meaning of "sex," "sexual," and "sexual relationship." *See McDowell*, 250 F.3d at 1363 (fact that roadside stop and questioning of truck driver near Florida seaport lasted approximately four hours did not

17

transform stop into "custodial interrogation," as would require *Miranda* warnings; truck driver's own actions, such as giving fictitious and plainly conflicting accounts for his presence in seaport, contributed to delay).  The agents spent an inordinate amount of time trying to understand the defendant's statements that his relationship with Minor 1 was sexual, but they had not sex, and that she was pregnant, possibly with his baby, but they had only hugged.  At the conclusion of the interview, the defendant rebooked his flight and left MIA, his freedom to depart the final piece of evidence that he was not in custody.  *See Howes*, 565 U.S. at 509.

## II.    Even assuming the defendant was in custody, the agents provided *Miranda* warnings.

Even if the Court finds that the defendant was in custody during his interview in Miami, the agents provided *Miranda* warnings, which the defendant indicated he understood, and then waived.  There are "two distinct dimensions" to determining whether a defendant validly waived his *Miranda* rights: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*  A waiver of *Miranda* rights is valid "[o]nly if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension."  *Id.*  Coercive police activity is also a necessary predicate to a finding that a waiver of *Miranda* rights is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 169–70 (1986).

### A. The defendant's *Miranda* waiver was knowing and intelligent.

As an initial matter, both the agents' description of the *Miranda* rights (Dkt. 93-1 ("we just want to make sure you understand everything . . . [f]or your own protection.")), and the form

containing a written statement of the *Miranda* rights (Exhibit 2), were legally correct. The agents did not, as the defendant claims, "cabin[] the scope of Mr. Inofuentes' constitutional rights" in order "to deceive him about the scope of his rights and the consequences of relinquishing those rights." Dkt. 93 at 2. They never stated he was being questioned only about drugs, or that his *Miranda* rights were applicable only to questions about drug smuggling.

Prior to providing the Statement of Rights form, the agents told the defendant, "based on, like we said, your travel, it seems that you have a lot of travel to Colombia, and so we have specific problem sets that we like to talk about related to your travel to Colombia." Dkt. 93-1 at 7. The agent said there used to be a big drug cartel problem in Colombia, but it is "[n]ot as big a problem anymore." *Id*. The agent said she wanted "to talk to you about **those types of topics**." *Id*. at 8. At no point did the agents say their questions would be wholly related to the issue of drugs, nor did they suggest or imply that the defendant's *Miranda* rights only applied—or were only being waived—to questions about drugs.[8] Further, the agents ensured the defendant had read and understood his rights. *See id.* ("you read them all?" "did you read them all?" "we just want to make sure you understand everything" "Read each one, and then put your initials at the end . . . as long as you understand it, put your initials" "if you don't, ask us and we'll explain it a little bit more").

The defendant claims that TFO Vargas's statement, "Let's do this" was said to encourage the defendant to sign the waiver. Dkt. 93 at 5. This claim is clearly belied by the transcript and the defendant's recorded interview. TFO Vargas said "Let's do this" and then directed the

---

[8] Moreover, commercial sex with minors is, in fact, a "problem set" specific to Colombia, and the defendant clearly agreed. *See* Dkt. 93-1 at 20 ("The thing is, I see so much of this. And I've been going down there since 2013. And it's just -- it's just not good. It's not good. And actually, it doesn't -- it kind of gross and all this. This is a big -- it's a big problem. It's huge. It's a huge problem.").

defendant to "read each one [referring to the rights] and then put your initials at the end of it, so that we [] as long as you understand it, put your initials.  If you don't, ask us and we'll explain it a bit more . . . Just want to make sure you're protected."  Dkt. 93-1 at 8.  TFO Vargas's statement had nothing to do with the waiver portion of the form; rather, it was entirely directed at making sure the defendant carefully read and understood his *Miranda* rights.

There was no affirmative misrepresentation in either the agents' very brief characterization of *Miranda* warnings ("for your own protection") or in the *Miranda* form itself. *See Parker*, 262 F.3d at 419 ("the Supreme Court in *Miranda* adopted **prophylactic procedural rules** that must be followed during custodial interrogations" in order to "**protect the right granted by the Fifth Amendment**" – i.e., the right against self-incrimination.) (emphasis added).  The law requires law enforcement to provide *Miranda* warnings to a subject in a custodial interrogation; that is clearly, undisputably, for the suspect's protection.  The agents' comments about providing the rights being for the defendant's protection were correct.  Contrary to the defendant's claims, they never suggested that *waiving* his rights was for his protection or would result in some benefit to him.

The cases to which the defendant cites to support his claim of deceit are inapposite.  He cites *California v. Prysock*, 453 U.S. 355, 360 (1981) for the proposition that *Miranda* warnings which do not fully advise the suspect of his rights are improper.  *See* Dkt. 93 at 6.  This is true, of course, but the *Prysock* Court's comment follows its analysis of two cases – *United States v. Garcia*, 431 F.2d 134 (CA9 1970) and *People v. Bolinski*, 260 Cal. App. 2d 705, 67 Cal. Rptr. 347 (Ct. App. 1968) – wherein law enforcement told the suspect that the right to have appointed counsel "was linked to a future point in time after police interrogation, and therefore did not fully

20

advise the suspect of his right to appointed counsel before such interrogation." *Prysock*, 453 U.S. at 360. The agents made no such misstatement in this case.

*Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884, 894 (11th Cir. 2003), is similarly inapplicable. In that case, the detective informed Hart of his *Miranda* rights according to a *Miranda* waiver form. *Id*. at 887. Hart waived his rights and agreed to an interview. *Id*. at 888. During the interview, Hart asked for the detective's opinion about whether he should hire a lawyer. *Id.* The detective gave her opinion and Hart asked further clarifying questions. *Id.* During this back and forth on the pros and cons of hiring a lawyer, the detective told Hart that if he hired a lawyer, the lawyer would tell Hart not to answer the detective's questions. *Id.* Then, "[d]uring this colloquy on the pros and cons of hiring a lawyer, [the detective] also told Hart that 'honesty wouldn't hurt him' " which 'contradicted the *Miranda* warning that anything he said could be used against him in court.' " *Id*. at 889, 894.

In *United States v. Clark*, 687 F. Supp. 3d 721, 755-56 (E.D. Va. 2023), a TFO with ATF mischaracterized exactly what rights Clark was waiving by stating that Clark was "not waiving any other rights except to have counsel here present at this time." However, "Clark was also waiving the right to remain silent and to assure that statements could not be used against him in court." *Id.* at 756. Thus, Clark's decision to waive *Miranda* was not knowing. *Id.* Again, no such misstatement occurred in this case.

In *United States v. Murphy*, 703 F.3d 182, 193 (2d Cir. 2012), a Trooper instructed the defendants that they could "decide at anytime to give up these rights, *and* not talk to us," incorrectly suggesting that the defendants *should* talk if they wished to exercise their rights—or put another way, that they would waive their rights if they remained silent. "By contrast, when correctly given, *Miranda* warnings clarify that a defendant may choose at any time to waive his

rights *or* maintain those rights, including the right to remain silent." *Id*. In *Murphy*, the Trooper's warning "confused waiver with the exercise of the defendants' rights" thereby failing to "ensure that the person in custody ha[d] sufficient knowledge of his ... constitutional rights relating to the interrogation." *Id*.

The above cases cited by the defendant are so far afield of the *Miranda* discussion that occurred in this case they are not remotely instructive. Here, the agents provided the defendant his *Miranda* rights via the Statement of Rights form. The form was accurate and included all of the *Miranda* rights. The agents ensured the defendant had read and understood the rights, but he did not ask any clarifying questions, and the agents did not expound upon what the individual rights meant, other than to say that the defendant could "stop" "at any point in time of this part" and say that he does not "want to answer that question" or "any questions." That was a correct summation of the defendant's right to remain silent. Neither Ballard nor Vargas intimated to the defendant that he had a duty to speak, only that if he spoke he was required to do so truthfully. This did not contradict his right to remain silent. *See Rivers v. United States,* 400 F.2d 935, 943 (5th Cir.1968) (holding that postal inspector's reference to 18 U.S.C.A. § 1001 during a custodial interview was not coercive but "merely emphasized that if Appellant was going to say anything, he had best tell the truth."). The agents did not "anchor [the defendant's] understanding of his constitutional rights to one 'line of questioning'" and the defendant clearly understood that because he said, "I'm willing to [] discuss anything." Accordingly, his waiver was made knowingly and intelligently.

### B. The defendant's *Miranda* waiver was voluntary.

With respect to the voluntariness of the defendant's *Miranda* waiver, the defendant contends that the circumstances of the interview, including the room, the fact that he missed his

connecting flight, and the agent's allegedly deceptive statement ("Don't worry") in response to missing the flight, rendered his waiver involuntary.  Dkt. 93 at 9-10.  For this argument, the defendant cites to *United States v. Giddins*, 858 F.3d 870 (4th Cir. 2017).

The defendant's argument and analogy to *Giddins* are misplaced.  In *Giddins*, police interviewers threatened to retain the defendant's car indefinitely "if he failed to sign the *Miranda* waiver and answer their questions."  *Id.* at 882.  The interviewers also "affirmatively misled Giddins as to the true nature of the investigation by failing to inform him that he was the subject of the investigation" and that they had an arrest warrant for him.  *Id.* at 884.  Put simply, the facts of *Giddins* are readily distinguishable from those at issue here in several key ways.

First, the animating principle of the *Giddins* decision is that the government may not threaten "substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself."  *Id.* at 882 (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977)).  In this regard, during the course of the interview in *Giddins*, the interviewers repeatedly threatened to withhold the defendant's property if he declined to speak with them.  By contrast, no one in this case threatened that the defendant's exercise of his right to remain silent would result in a "substantial penalty."  *Id.*  Contrary to the defendant's claim, he did not express anything remotely like concern about his connecting flight during the interview.  The defendant told the agent, "Oh, I missed the flight already" and then he said, "Okay. Let's go for it."  That was before the agent said they would get him on another flight, and the defendant said he was "hoping to be on the three o'clock flight."  The defendant's claim that his waiver was involuntary due to concern about his missed connecting flight is contradicted by his own

recorded statements.[9]  Taken as a whole, the "totality of the circumstances" of the defendant's interview clearly show that the defendant's *Miranda* waiver was made voluntarily.

### III.    The defendant's admissions were made knowingly and voluntarily.

A confession is admissible unless it was the product of "threats or violence," "direct or implied promises," or "the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-42 (1897)).  "'[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause.'"  *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc) (quoting *Connelly*, 479 U.S. at 167); *see also Giddins*, 858 F.3d at 881 (citing *Cristobal*, 293 F.3d at 140-41).

However, even the existence of "threats, violence, implied promises, improper influence, or other coercive police activity," is not enough to render a statement involuntary where the defendant's will has not been "overborne" nor his capacity for self-determination "critically impaired."  *Braxton*, 112 F.3d at 780-81 (citing *Pelton*, 835 F.2d at 1071 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973))); *see also Giddins*, 858 F.3d at 881.  In conducting this evaluation, the Court should consider the totality of the circumstances, including "'the

---

[9] Nor can the defendant support this shaky argument with the fact that agents presented the case to an AUSA in SDFL after he confessed to sex with a minor in Colombia.  This was clearly done after the defendant's confession and therefore could not have been contemplated when the defendant waived his *Miranda* rights.  But even if that had been the plan all along, it would not invalidate the defendant's *Miranda* waiver; the agents were under no obligation to tell the defendant he was under investigation.  *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (citations omitted) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."); *Braxton*, 112 F.3d at 784  ("Indeed, there is no duty to advise [a defendant] of the identity of the specific offense under investigation."); *compare with Giddins*, 858 F.3d at 870 (Giddins inquired twice whether he was in trouble and was told no, despite the fact that the police had an arrest warrant for him.).

characteristics of the defendant, the setting of the interview, and the details of the interrogation.'" *Id.* at 781 (quoting *Pelton*, 835 F.2d at 1071); *see also United States v. Hunter*, 912 F. Supp. 2d 388, 399 (E.D. Va. 2012) ("The Supreme Court has noted the following factors as relevant in determining the voluntariness of a statement: the youth of the accused; a lack of education; low intelligence; lack of any advice to the accused of her constitutional rights; the length of detention; repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.").

Moreover, a defendant's lies or selective admissions to law enforcement are evidence that his will and self-determination remained intact during an interview. *See Murphy*, 465 U.S. at 438 ("[T]he fact that Murphy apparently felt no compunction about adamantly denying the false imprisonment charge on which he had been convicted before admitting to the rape and murder strongly suggests that the 'threat' of revocation did not overwhelm his resistance."); *see also United States v. Adil*, 607 F. Supp. 3d 644, 655 (E.D. Va. 2022) ("The fact that Defendant admitted to some conduct and denied other allegations emphasizes the fact that Defendant felt free to choose what to say during the interview."). Finally, the burden on the government to establish voluntariness is merely preponderance of the evidence. *See Braxton*, 112 F.3d at 781 (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

In this case, the circumstances make clear that the defendant's will and capacity for self-determination remained intact throughout his interview. The defendant was 44 years old at the time of his interview and is a native English-speaker. He was previously married and is a father. The defendant is not young and impressionable nor easily coerced. He is educated, professionally and socially capable, and certainly able to hold his own in a law enforcement interview. *Compare Adil*, 607 F. Supp. 3d at 654 (finding statement voluntary where defendant

25

was 24-year-old refugee who spoke no English and was dependent on the government for protection).

Furthermore, the setting and details of the interview support a finding of voluntariness. The interviewing agents were in plain clothes and never displayed their weapons. The defendant was not handcuffed or physically restrained in any way. The tone of the interview was not hostile and remained cordial throughout. The defendant certainly felt comfortable enough with the agents to repeatedly lie to them about the nature of his relationship with the victim. *See Murphy*, 465 U.S. at 438; *Adil*, 607 F. Supp. 3d at 655. And at the conclusion of the interview, the defendant left the airport and returned to his home in Virginia.

At no time did law enforcement use threats, violence, direct or implied promises, or exert any improper influence during the defendant's interview. In support of his claim that he was unduly coerced, the defendant points to 8 instances during the interview when the agents either told him to tell the truth or couched their questions in terms of "box checking." Dkt. 93 at 11. However, a closer examination of these statements reveals that the agents were not compelling the defendant to speak, but rather warning him that if he lied to them (as he appeared to be doing), he would be committing a crime. *Braxton*, 112 F.3d at 782 ("Admonishing a suspect to tell the truth during an investigatory interview by informing him of the statutory penalty under 18 U.S.C.A. § 1001 for making false statements does not constitute coercive police conduct rendering a statement involuntary."); *Rivers*, 400 F.2d at 943 (showing suspect Section 1001 during custodial interrogation "merely emphasized that if Appellant was going to say anything, he had best tell the truth. No one made any intimation that Appellant had a duty to speak or that the statute placed such a duty upon him"). Other courts have similarly held that accusing a suspect of lying to elicit further statements is not improperly coercive. *See Simmons v.*

*Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001); *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987) ("The fact that [law enforcement] accused Wolf of lying does not automatically render the questioning coercive, as an interrogator can legitimately express his disbelief at a defendant's story in order to elicit further comments or explanations.").  Therefore, it cannot be said that law enforcement made a specific decision, statement, or action – in other words, that they engaged in coercive activity – which is "necessary" to find that a statement is involuntary.  *Braxton*, 112 F.3d at 781; *Giddins*, 858 F.3d at 881.

The agents never promised the defendant leniency in exchange for his statements.  In fact, they did not make any promises at all.  The defendant claims that "Agent Ballard implicitly promised Mr. Inofuentes that the only way he would 'get . . . in trouble' was if he did not answer their questions honestly and truthfully."  Dkt. 93 at 12.  Not so.  The defendant went back and forth with the agents about the nature of his relationship with Minor 1.  The defendant said, "I don't have sex with her" but then said he probably had "sexual photos."  Dkt. 93-1 at 24.  While he was telling obvious lies, SA Ballard reminded him to be honest, because "obviously like I said, we can see it, we can read it, we have to ask you about it."  *Id*.  The defendant went on to question the meaning of the term "sexual relations."  *Id*. at 25.  Again, SA Ballard reminded him to be honest because "it's actually illegal to lie to us."  *Id*.  The defendant continued to utter absurdities, like admitting he had a sexual relationship with Minor 1, then claiming that they only "kiss[ed]" and "hugg[ed]."  *Id*. at 26.  The defendant dug his hole even deeper, until the agents stopped him and said, "Please be honest. I'm sorry. I just don't want you to get yourself in trouble" "Just say it." "Please be honest." "You just have to say it. Plain English." *Id*. at 27. These were not attempts to force the defendant to speak; they were attempts to stop the defendant

from committing the further crime of lying to federal law enforcement agents.  Nonetheless, the

defendant continued to lie.  Dkt. 93-1 at 28.

- VARGAS: Okay. So you guys were laying in bed?
- INOFUENTES: This is like --
- VARGAS: And nothing happens? I mean --
- INOFUENTES: But sex, no. Honestly.
- VARGAS: Yeah. But nothing happens in bed? I mean, you're there and you guys -
- INOFUENTES: I'm going to have to defend this until, like, until the end. I guess -- I don't know about, like, missing flights or -- or being in trouble. I know you're boring me. Honestly, but I'm just trying to give you the information that I have. I'm not having sex with her and this was just that time. And since then, honestly.
- VARGAS: Mm-hmm. So you had sex with her then, but not now, is what you're saying?
- INOFUENTES: No.
- VARGAS: Because that's what you said earlier, that you had sex with her that one time.
- INOFUENTES: Sexual relations. Okay. You want to say like a hugging. Okay. I don't – I don't like to say I'm hugging her and, like, hugging like a -- like a sister. Absolutely not.
- VARGAS: Yeah. You were hugging her like a girlfriend.
- INOFUENTES: Like -- like -- like a girlfriend. So that's why I say sexual -- sexual.
- VARGAS: So that's as far as the extent you went with her was hugging her?
- INOFUENTES: No.
- VARGAS: Okay. What was the furthest you went with her?
- INOFUENTES: But not -- Okay. This is, like, a -- a -- a sex -- sexual, like -- like -- like, affection.
- VARGAS: That's affection, a hug. You're demonstrating a hug. That's affectionate. After the hug, what happened?
- INOFUENTES: What happened? I was just -- I -- I -- I was -- I was -- I'm honestly just -- like you said, spooning with a girl.
- VARGAS: Okay. And you're both clothed in bed?
- INOFUENTES: Pajamas.

The defendant did not say he wanted to end the interview, as he claims (Dkt. 93 at 14),

nor did he say he wanted to "continue his travels and end the interview as quickly as possible"

(*id.*).  As stated above, the defendant casually remarked that he had missed his connecting flight,

but then immediately said, "Okay. Let's go for it."  Dkt. 93-1 at 8.  When he brought up the

connecting flight later in the interview, the defendant stated (as opposed to asked) that he would

be "out of here probably, like, in a half an hour or an hour maximum." *Id*. at 15. There was no request to leave or end the interview and no sense of urgency that he needed to be done immediately in order to make a connecting flight. In fact, at various times the defendant expressed appreciation for the agents' work and indicated that he would be available if they wanted to be in touch with him, and he would be "happy to help."

The defendant's purported exhaustion during the interview does not render his statements invalid, either. *Holmes*, 670 F.3d at 592 ("even if Holmes was tired on the day of his interrogation, suppression is not required every time a defendant has a diminished mental state . . . [r]ather, there would also have to be evidence that the police took advantage of Holmes' incapacitation.") (citing *Cristobal,* 293 F.3d at 141 ("[A] deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary.")).

The defendant also cannot claim that he was unfamiliar with the criminal justice system or the potential significance of a police interview. *See Correll v. Thompson*, 63 F.3d 1279 (4th Cir. 1995) (Evidence indicated that defendant's waiver of his right to counsel before he confessed was voluntary; defendant testified unequivocally that he was not subjected to any form of physical coercion or deprivation by police and, although defendant possessed I.Q. of only 68, he was 24 years old and had had numerous experiences with law enforcement and with *Miranda* warnings.); *United States v. Robinson,* 404 F.3d 850, 861 (4th Cir. 2005) ("Although Robinson admittedly has a low I.Q. [70] and several mental disorders, nothing in the record indicates that Robinson could not understand the rights as Agent Hicks provided them. To the contrary ... Robinson was 'street smart' and understood his *Miranda* rights.").

While the defendant's criminal history is not lengthy, it certainly cannot be said that he "has no meaningful experience with the criminal justice system." Dkt. 93 at 15. In 2013, the defendant was arrested in Fairfax County on a charge of domestic assault and battery. *See* Exhibit 3 (Police Report). According to the Police Report, Fairfax County police were dispatched to the defendant's home in response to a domestic violence call. On scene, the police interviewed the victim and then the defendant, who admitted to pushing the victim and covering her mouth with his hand and a pillow. *Id*. at 3. As a result of the on-scene investigation, the defendant was arrested and charged with domestic assault and battery. The defendant pleaded guilty to the charge, which was ultimately dismissed based on his completion of a domestic violence class and active probation.

In sum, the circumstances of the interview and the defendant's background show that the defendant's statements were voluntary. Moreover, there is no evidence of coercive police activity. Thus, the defendant's motion should be denied, and his statements should not be suppressed.

## CONCLUSION

For the reasons stated above, the Court should deny the defendant's Motion to Suppress.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date: July 7, 2025      By:      _____/s/_____

Lauren Halper
Laura Withers
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Ave. Alexandria, Virginia 22314
Email: Lauren.Halper@usdoj.gov
Email: Laura.Withers@usdoj.gov

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

By: _____/s/_____
           Lauren Halper
           Assistant United States Attorney
           United States Attorney's Office
           2100 Jamieson Ave.
           Alexandria, Virginia 22314
           Phone: 703-299-3700
           Email: Lauren.Halper@usdoj.gov